1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                     DALLAS DIVISION

3   KANEKA CORPORATION,          (  CAUSE NO. 3:10-CV-1430-P
            Plaintiff,           )
4                                (
    vs.                          )
5                                (
    JBS HAIR, INC., UNO & COMPANY,)
6   LTD., and JINNY BEAUTY SUPPLY (  JUNE 27, 28, 2013
    COMPANY,                     )  DALLAS, TEXAS
7           Defendants.          (  8:30 A.M.
    _____

8

9                        VOLUME 9

10

11  _____

12                   TRIAL ON THE MERITS

13

14         BEFORE THE HONORABLE JORGE A. SOLIS
             UNITED STATES DISTRICT JUDGE
15                    and a jury
    _____

16

17

18

19

20

21

22            SHAWN M. McROBERTS, RMR, CRR

23           1100 COMMERCE STREET, RM. 1654

24              DALLAS, TEXAS  75242

25

```
 1                        A P P E A R A N C E S

 2

 3
              FOR THE PLAINTIFF:   PROCOPIO, CORY, HARGREAVES
 4                                 & SMITH, LLP
                                   12544 HIGH BLUFF DR., SUITE 300
 5                                 SAN DIEGO, CA  92130
                                   (619) 238-1900
 6                                 BY:  MR. ANTHONY DAIN
                                        MR. FREDERICK TAYLOR
 7                                      MS. AUBREY HADDACH

 8                                 COKINOS, BOSIEN & YOUNG
                                   105 DECKER COURT, SUITE 800
 9                                 IRVING, TX  75062
                                   (817) 635-3616
10                                 BY:  MR. ROBERT DAWSON, JR.

11            FOR THE DEFENDANTS:   FENWICK & WEST, LLP
                                   SILICON VALLEY CENTER
12                                 801 CALIFORNIA STREET 12377
                                   MOUNTAIN VIEW, CA  94041
13                                 (650) 988-8500
                                   BY:  MR. DARRYL WOO
14                                      MR. RYAN MARTON
                                        MR. JEFFREY LASKER
15                                      MR. JOSEPH BELICHICK

16            OFFICIAL REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                   1100 COMMERCE STREET, RM. 1654
17                                 DALLAS, TEXAS  75242
                                   (214) 753-2349
18

19

20

21

22

23

24

25
```

## <u>INDEX</u>

| **Charge Read** | **Page** |
|---|---|
| | 30 |

| **Closing Arguments** | **Page** |
|---|---|
| MR. DAIN | 31 |
| MR. WOO | 76 |
| MR. DAIN | 137 |

| **Verdict** | **Page** |
|---|---|
| | 151 |

```
 1              THE COURT:  Good morning.

 2        All right.  Outside the presence of the jury, after both

 3   parties -- all the parties have rested and closed, we have now

 4   prepared a revised draft of the Court's charge to the jury.

 5   The parties have been given copies of that.

 6        Mr. Dain, any objections to the changed part or, Mr.

 7   Taylor, to the parts we changed from yesterday?  Can I take

 8   your silence as no objection?

 9              MR. TAYLOR:  The fact I'm standing indicates more of

10   a yes as I gather my thought here.  But I guess the only issue

11   we have is with the indirect infringement regarding the active

12   inducement of others.

13              THE COURT:  Yes.

14              MR. TAYLOR:  And I think that --

15              THE COURT:  What page are you on?

16              MR. TAYLOR:  I'm on page 28.

17              THE COURT:  28.

18              MR. TAYLOR:  I believe the problem, Your Honor, as

19   articulated in the correspondence that I sent to opposing

20   counsel last night and I shared with Mr. Snyder this morning,

21   the Court's clerk, is that I believe that the way the

22   instruction is written now, it sort of unfairly limits Kaneka

23   to just the particular importers that are named here.

24        And what we have here is an entire class of goods that

25   are being imported into the United States.  We've got UNO's
```

1    own documents which say that they're directing the Natura

2    products, which are later named the Unolon products, directing

3    that class of goods into the United States as opposed to some

4    of their other products, such as the Falang product which is

5    directed to another region.  That is directed to Africa.

6         So you've got this class of goods coming to the United

7    States.

8         We've got testimony from our own witnesses that they've

9    gathered information from the wig manufacturers as to where

10   these products are headed.  They are headed to the United

11   States.

12        And we've also got evidence that they have

13   specifically been -- that is, UNO has been meeting with the

14   manufacturers, meeting with the importers before the patent

15   was issued and even after the patent was issued to direct

16   these products toward the United States.

17        I mean, I don't think it's a secret they were trying to

18   do that even before they knew the patent was going to issue or

19   knew --

20             THE COURT:  I understand that background.  I don't

21   know your point yet.  Go ahead and make your point.

22             MR. TAYLOR:  The point is that I think the case law

23   provides that if you've got a class of goods that are

24   infringing that are coming into the United States or that are

25   infringing, that we don't have to identify specific instances

1    of direct infringement by the direct infringers.  We can

2    direct the infringement to that class of goods that we know

3    are infringing.

4          THE COURT:  And so your proposal would be?

5          MR. TAYLOR:  Our proposal would be that --

6          THE COURT:  Well, go ahead.

7          MR. TAYLOR:  -- the instruction would read that they

8    induced others, other importers into -- they induced other

9    importers to directly infringe.

10         MR. DAIN:  And if I could add, Your Honor, we have

11   testimony from our expert witness, Dr. Jacobs, that as to a

12   whole line of Natura and Unolon products --

13         THE COURT:  We're asking about the line in the

14   question.

15         MR. DAIN:  I understand.  But the documents mostly

16   say Natura to the United States and Unolon.  So if -- it

17   shouldn't be -- and this came up by one of Defense counsel who

18   said it's the UNO that infringes, not the product.

19         So the point is we have evidence that the Natura and

20   Unolon fibers are coming to the United States, those infringe,

21   we have damages.  To then say, okay, identify which importer

22   and which, you know, Natura EZ here for this importer, is

23   asking too much.  It should be we have these importers,

24   exemplary of these that we've listed, and the Natura and

25   Unolon fibers are coming in, the same as for JBS and Jinny.

1   They'll say, get us your Natura fibers.  They're not saying, I

2   specifically want Natura EZ versus Natura XO.

3       So we shouldn't be having do these items infringe, you

4   know, the Natura I, Natura II.  We should be having, have they

5   proven that they've induced infringement by these importers of

6   their Natura and Unolon fibers.  That's really where the issue

7   is.

8           THE COURT:  And you're saying that the infringers --

9   that Dinacorp (phonetic) case that you're citing --

10          MR. DAIN:  Yes.

11          THE COURT:  -- you had a class of infringers

12  involved in that case --

13          MR. DAIN:  Right.

14          THE COURT:  -- not a class of goods.

15          MR. DAIN:  Right.

16          THE COURT:  They were a class of infringers.

17          MR. DAIN:  Right.  And all of these infringers are

18  importing the Natura and Unolon fibers, and they infringe

19  because our expert said, I don't care which these it is, and

20  we've narrowed the list to what they are, they're eight of

21  them, whichever those are, they infringe, and that's what

22  you're importing.  That's the point we're making.

23          THE COURT:  So you're saying the class is the class

24  of infringers importing the infringing goods into the United

25  States.

1          MR. DAIN:  Exactly.  We can go item by item and ask

2     the jury to check that box or, you know, circle them.  It

3     just -- it doesn't need to be that way is the point.

4          THE COURT:  So how would it be, that inducing

5     others, or you find that --

6          MR. DAIN:  Yes.

7          THE COURT:  And --

8          MR. DAIN:  And we can give examples of those names,

9     we have them listed here, and are they importing -- so the

10    items -- you can have an instruction that says, do these items

11    meet the elements?  Yes, yes, yes.  And I thought that was

12    what counsel was saying yesterday, have something, all these

13    products meet the elements.  Now, you have --

14         THE COURT:  And we have that on the infringing

15    questions.

16         MR. DAIN:  Exactly.  Now, for inducement, have they

17    induced others to infringe by importing one or more of those

18    items?  That's kind of --

19         THE COURT:  Without listing them all?

20         MR. DAIN:  Yeah.  That was really the -- the issue

21    we had because each of these questions say for inducement or

22    whatever, circle, circle, circle, circle for these.  And we

23    have -- I mean, there are many more importers than we listed.

24    We just went with the ones where we could tie this document to

25    this importer to this -- you know, like to JBS or something.

1    So that was our --

2           THE COURT:  So your evidence isn't clear as to which

3    of the importers are necessarily involved with the product

4    bringing it in?

5           MR. DAIN:  Well, let me just give you an example.

6    JBS will say, the question was asked, does whatever your

7    beauty collection include Natura fibers?  Yes.  It includes

8    Natura fibers.  Now, whichever Natura that was, we've got our

9    expert saying it infringes.

10       Do we need to say, well, JBS was importing Natura EZ or

11   Natura XO, circle that, rather than do we have evidence that

12   there are infringers directly infringing in the United States

13   by selling the Natura and Unolon fibers, and do we have proof

14   that those Natura and Unolon fibers as a group do infringe?

15   And if so, I think we've met our burden and we should --

16          THE COURT:  Well, I was really asking on the others.

17   I mean, the Jinny and JBS are specifically identified.

18          MR. DAIN:  Right.  And Royal Imax --

19          THE COURT:  They're not a class.  You've got just

20   two specific retailers that you claim are directly infringing.

21   The others is where we started off.

22          MR. DAIN:  Yeah.  And the others, we have documents

23   where the idea is, let's say UNO will say, well, I know that

24   Royal Imax, or whatever, is number one, two, three importer of

25   artificial hair into the United States.  And we have evidence

1    that they are importing Natura into the United States.  And

2    then we have evidence that Natura just changed its name.  Even

3    if they say they changed their product design, our expert says

4    all of those infringe.  So we have that evidence that the

5    fibers they're importing are the infringing fibers.

6         Do we need then to say, well, Royal Imax is importing

7    Unolon XO or whatever versus Unolon --

8              THE COURT:  Well, there's two issues that you're

9    raising, though.  One is we don't need to list all of those

10   specific products on the inducement question.

11             MR. DAIN:  Right.

12             THE COURT:  That we don't need to do that.

13             MR. DAIN:  Right.

14             THE COURT:  But then the other one you're raising is

15   this class of infringers --

16             MR. DAIN:  Right.

17             THE COURT:  -- which is a separate issue.

18             MR. DAIN:  Right.  And what I'm saying is as long as

19   we --

20             THE COURT:  Because we've identified the one's that

21   you've identified, and you're saying you don't need to do

22   that.

23             MR. DAIN:  No.  That's okay.  We can identify those

24   as the class of infringers.  What we don't want to be forced

25   to do is identify for those infringers, you know, do they --

```
 1              THE COURT:  Line up the products with each

 2    infringer?

 3              MR. DAIN:  That's what we don't want to get into the

 4    issue of, and I don't think we need to.  So what I'm saying is

 5    the way the Court has it, we can do it that way, it just to me

 6    it complicates and confuses things by implying that we've got

 7    to say Royal Imax imported Natura XO or EX or EZ or whatever

 8    it is versus --

 9              THE COURT:  But they're not being asked to do that.

10    They're not asked to line up the product with one of the five.

11    It just has to be one or however many you listed, one of those

12    importers.

13              MR. DAIN:  Well, if we look at like --

14              THE COURT:  What page are you looking on?

15              MR. DAIN:  Question No. 7, page 30.

16              THE COURT:  Page 30.

17              MR. DAIN:  Yes.  It says, you know, has Kaneka

18    proven it's more likely not and it goes on and it lists

19    intending to cause these importers, you know, acts of taking

20    constitute infringement.  And it says, for each product answer

21    yes to all of the above questions.  See, so now we're tying to

22    the product.  So we're saying --

23              THE COURT:  But it doesn't ask the jury to Natura I

24    to tie it into the Shake-N-Go, Sun Tae Yang, and Unolon.  It's

25    not asking for that.
```

```
 1            MR. DAIN:  And I'm fine with that if the record is

 2   clear that if they circle yes to Natura I and Natura II and no

 3   to Unolon I, there isn't going to be some issue, well, then we

 4   failed in our proof because, you know, we haven't shown that

 5   Shake-N-Go was actually, you know, the one selling Natura I or

 6   II.  I just want to make that clear.

 7            THE COURT:  Well, I don't know what kind of issues

 8   will come up afterwards.  We're trying to draft a question for

 9   the jury that's based on the evidence.  You know, lawyers can

10   file all kinds of motions.  I'm just trying to draft a

11   question that fits the evidence that your theory can be passed

12   on by the jury, in effect --

13            MR. DAIN:  Right.  Okay.

14            THE COURT:  -- that they can look at your theory and

15   make a decision as to whether you have proven it or not.

16            MR. DAIN:  Okay.  I'm sorry.

17            THE COURT:  I guess I'm still not understanding what

18   your specific problem is other than you are worried about some

19   post judgment issue that might come up.  How are you proposing

20   to address that?

21            MR. DAIN:  I just think if any of the ones below are

22   yes, then the answer is yes to this.  I mean, as long -- I

23   guess I still get back to I just don't want there to be any

24   confusion that there's some requirement to tie any of these

25   particular lines to any particular one.  And I don't think --
```

```
 1    that's why I'm saying I think we can do it this way.  I don't

 2    think that's what the Court is doing.

 3        I'm just anticipating an argument by the Defendant saying

 4    there's some failure to prove.

 5            THE COURT:  Do you have a proposal for how you want

 6    this changed to avoid what you see as a potential problem?

 7            MR. DAIN:  My proposal would have been to say, did

 8    they intend to cause these, you know, all these importers we

 9    listed, to import Unolon or Natura products.  And that's

10    similar to what we have with JBS and Jinny.  In fact, I mean,

11    that would put them in the same kind of boat.  For instance,

12    JBS sells these --

13            THE COURT:  Instead of having for each product

14    listed below, it would be --

15            MR. DAIN:  Yes.

16            THE COURT:  -- Unolon and Natura products?

17            MR. DAIN:  Yes.  Yes.  That's what we would propose.

18    Sorry it took so long to get that to you, but that is --

19            THE COURT:  Mr. Marton?

20            MR. MARTON:  Yes.  There's no doubt, I don't think

21    anyone is debating, that to get indirect infringement, there

22    must be proof of direct infringement.  And I understand, and

23    we all discussed yesterday, that direct infringement is

24    generally -- or infringement is judged by an infringer and not

25    a product.
```

```
 1          But that said, we have distinct products here that need
 2    to be evaluated, first, do they meet the limitations of the
 3    claims, and then were they imported into the United States.
 4    And the proposed Questions 7 and 8 with respect to the other
 5    infringers do not tie a particular product to a particular
 6    importer.
 7          We just need an answer as to whether or not for each
 8    product was that product --
 9              THE COURT:  There's evidence that that product was
10    --
11              MR. MARTON:  -- is there evidence that that product
12    met the limitations of the claim.
13              THE COURT:  Well, it met the limitations is answered
14    by the first questions.  Well, actually, that's right.  Here
15    we're lumping them together, aren't we?
16              MR. MARTON:  Yes, we had to lump it together.  I
17    tried too break it out, as we discussed yesterday, but it just
18    seemed like too many questions.
19              THE COURT:  Okay.
20              MR. MARTON:  And it was more efficient to put it all
21    together in one set.
22              THE COURT:  So you're right, it has to meet the
23    limitations, and then --
24              MR. MARTON:  And we have not -- to be quite honest,
25    I think that the law does require that they show this
```

1   infringer -- this direct infringer imported this product on

2   this date and you induced that infringement.

3       But to move this ball forward, we tried to work with the

4   Court and the other side to come to some reasonable verdict

5   question that would allow for some confusion as to who exactly

6   is shipping what.

7       But we cannot avoid the two fundamental questions which

8   are, does this product meet the claim limitations and was it

9   imported.  And then the other question is, did UNO induce that

10  infringement.  And I think the questions as framed do that.

11      THE COURT:  I think it does, too.  And because we

12  did include the infringement issue as part of this question,

13  you know, and the infringement questions for JBS and Jinny, we

14  do list every product in terms of whether it meets the

15  limitations and infringes.  And we're doing the same here

16  except we're now adding the inducement elements to it to the

17  infringement claims.

18      MR. MARTON:  Thank you.

19      THE COURT:  And I don't think it does -- you know,

20  we can face that when we just have to face it.  I don't think

21  it does what you're afraid that issue that may come up.  I

22  don't think it does that the way it is worded.  And I think,

23  because it includes the infringement language for sure, we

24  have to ask about each product.

25      And I'm not sure that -- Mr. Marton may be correct

1    because you do have the second issue of, okay, this product

2    infringes.  But to get the direct infringement, you have show

3    that it was imported into the United States, not just a class

4    of products, but the particular products you're claiming.

5              MR. DAIN:  Understood.  And we will just get into

6    the disagreement about whether we have to show a particular

7    date and this one --

8              THE COURT:  It doesn't require that.  The question

9    and answer doesn't require you show that -- it doesn't even

10   require that you tie the product into a particular name.  The

11   question is worded under that number 2, you go to the top of

12   the paragraph, it lists the individuals and lists those

13   companies and/or.  So there is no -- I don't see anything in

14   there that requires.

15      And then when it comes down to listing the product, there

16   is nothing about linking it to any particular importer that I

17   see there.

18             MR. DAIN:  Okay.  And I understand the and/or.  I

19   understand.  And I may have been looking at the second one,

20   not the first one, and I apologize.  If you go down two more

21   lines --

22             THE COURT:  What element are you under?

23             MR. DAIN:  4.  UNO was aware, and it goes through

24   them, and Jigu, it should probably say and/or.

25             THE COURT:  And/or?

1          MR. DAIN:  Yes.  I'm sorry.

2          MR. MARTON:  That is a typo.  That should say

3   and/or.  It is consistent with -- No. 8 actually has and/or in

4   the exact same place.

5          MR. DAIN:  Thank you, Your Honor.

6          THE COURT:  Okay.  That takes care of that then?

7   Any other issues?

8          One other issue from the Plaintiffs, on Question No.

9   8 we don't have any products named.  And we received an email

10  saying y'all hadn't been able to agree as to any products that

11  go there?

12         MR. MARTON:  Yeah.  The issue here is for the '430

13  Patent, there needs to be a product other than what UNO sells

14  because it has to have human hair.  And we have all agreed UNO

15  doesn't sell any products with human hair.  So like was done

16  for JBS when Beauty Collection 2 is accused of having human

17  hair, we need specific finished wig products identified here.

18         MR. DAIN:  We can make that simple.  Let's just pull

19  that one.

20         THE COURT:  You don't want that one?

21         MR. DAIN:  Yeah, because we can't identify a

22  specific one of those products with human hair for the rest of

23  them.  They just say Natura or whatever in a general sense.

24         THE COURT:  So you want to just omit question No. 8

25  then.

```
 1                    MR. DAIN:  Yes.

 2                    THE COURT:  Okay.

 3                    MR. DAIN:  So the '430 will be limited to the Beauty

 4        Collection 2 for JBS.

 5                    THE COURT:  JBS.  Okay.  All right.  Anything else

 6        from the Plaintiff?

 7                    MR. DAIN:  No, Your Honor.

 8                    THE COURT:  All right.  Mr. Lasker?

 9                    MR. LASKER:  Just two very, very minor.  On page 24

10        and 29, there just needs to be a space in between "the" and

11        '429.

12                    THE COURT:  Okay.  On page 24 and 28?

13                    MR. LASKER:  24 and 29.

14                    THE COURT:  Okay.  All right.  Yes.  Anything else?

15        We can live with those objections.

16                    MR. DAIN:  And I'm sorry.  I thought we had -- we

17        did email over some of the products we had reduced.

18                    MR. MARTON:  Oh, I didn't realize that.

19                    MR. DAIN:  So this can probably just be global.

20                    THE COURT:  What page are you looking on?

21                    MR. TAYLOR:  Throughout.

22                    MR. DAIN:  Throughout.  It will be multiple pages.

23        But taking Question 5, for instance, because I think that kind

24        of does them.

25                    And, Fred and Aubrey, make sure if I miss one.
```

```
 1              It's on the Unolon side -- or, no, Natura II, is

 2    that out?  That's in?  Then on Unolon, which are the ones that

 3    are out?  Okay.  Unolon H4, Unolon N, Unolon N70, and Unolon

 4    H2.

 5              THE COURT:  Okay.  So those are out on each

 6    question.

 7              MR. DAIN:  Yeah.  On each question, those are out.

 8              MR. MARTON:  That works.

 9              MR. LASKER:  Each question in addition to the direct

10    infringement questions?

11              MR. DAIN:  Which one are you talking about?

12              MR. LASKER:  I'm talking about Question No. 1.

13              THE COURT:  Question No. 1 on page 18.

14              MR. DAIN:  Yeah.  Each one.

15              MR. MARTON:  So each question related to

16    infringement should have those products removed.  That's my

17    understanding.

18              MR. DAIN:  Correct.  I just happened to fall on

19    Question 5 when I said it, but it is all of them.

20              MR. TAYLOR:  And we should also similarly change

21    page 10 to omit those products.

22              THE CLERK:  So take it out of the whole document?

23              THE COURT:  All right.

24              MR. TAYLOR:  Correct.

25              MR. DAIN:  And I guess we're good to go.
```

1          THE COURT:  Okay.  Let us make these changes and

2     then we will come in and I will read the charge to the jury.

3     I think I explained that yesterday, and then we will go into

4     closing argument.

5        We won't finish by lunch.  I'll let him go ahead and make

6     his opening, let you make part of yours.  Do you want to break

7     it up or you would rather just wait?

8          MR. WOO:  I would rather wait and have it all

9     together.

10          THE COURT:  Let's see where we are.  I thought most

11    of the time the defense at least wants to get part of it in.

12    They don't want to go to lunch with just the Plaintiff's half,

13    but if you want to wait and we're at a place where we can

14    break, certainly we can do that.

15          MR. WOO:  We will see how the timing goes.  I just

16    want a clarification.  We see Your Honor's ruling last night

17    at the JAML, but we assume that they cannot argue that to the

18    jury.

19          THE COURT:  No, that's exactly true.  And let me

20    state on the record that I am granting your motion for

21    judgment as a matter of law on the inequitable conduct.

22          MR. DAIN:  And then one last thing.  We had a

23    stipulation on damages.  We need to read that to the jury so

24    they understand.

25          MR. LASKER:  So we provided numbers to the

1    Plaintiffs, specific numbers, and we just haven't received --

2              THE COURT:  You haven't drafted it up yet?  See if

3    you can work on putting something --

4              MR. DAIN:  I think we agreed.  Maybe we just didn't

5    sign it.

6              MR. LASKER:  I have never seen a pleading with a

7    stipulation.

8              MR. DAIN:  We can read it.  We can just state it to

9    the jury.

10             THE COURT:  Just read it and then put it in a more

11   formal form.  But do you have something in writing that you

12   can read to them?

13             MR. TAYLOR:  We can do that.

14             MR. DAIN:  Okay.  So we will do that.

15             THE COURT:  Be working on that while we are making

16   these changes.

17             MR. DAIN:  Okay.  And, Jesse, can you email to

18   Michelle and us the finals so when we're talking to the jury,

19   I can refer to a page or Mr. Woo can and it will show up on

20   the screen?

21             MR. MARTON:  We have one more issue.  We took the

22   argument out of the demonstrative slides we used throughout

23   the case and presented them last night to Kaneka, and we

24   understand they have some objections that probably make sense

25   to resolve those now.

```
 1              THE COURT:  Yes.

 2              MR. TAYLOR:  We are talking about the exhibits.

 3   Correct?

 4              MR. MARTON:  The demonstratives.

 5              THE COURT:  That used to be demonstrative.  That

 6   used to be.

 7              MR. TAYLOR:  So from Defendants' opening statement

 8   we got -- and I'm not sure if the Court has a copy of these.

 9              THE COURT:  I don't.

10              MR. MARTON:  What is the DTX number?

11              MR. TAYLOR:  1280.

12              THE COURT:  Why don't you come to the bench so I can

13   look at them.  I don't have them before me.

14              MR. TAYLOR:  So any place where there appears to be

15   an infringement chart, I think that's argument.

16              THE COURT:  Infringement on the patent?

17              MR. TAYLOR:  Yes.  But the checkmark is the --

18              MR. MARTON:  It's the same as having a box showing

19   the analysis of the accused products.  It's just on the

20   invalidity side.  We're saying --

21              THE COURT:  I don't think that's unfair.  The jury

22   heard it and they saw the check.  They know that's the

23   Defendants' position.  I don't think that's unfair argument.

24              MR. TAYLOR:  Well, I mean, to the extent that it

25   goes back to them, I think that's the problem I have.  I
```

1    obviously don't have a problem with them using that and

2    marking up something that says they infringe.  That's what I

3    expect them to do.

4        But to have it back there with them I think is

5    problematic.  I mean, it's taking their closing argument with

6    them.  They're going to take notes on the closing argument.

7                THE COURT:  It's their evidence.  There is evidence

8    to support that.

9                MR. TAYLOR:  I have all that.  It is just --

10               THE COURT:  But this reflects that -- I don't have a

11   problem with that graphic on the molecule.  That's part of the

12   patent.  I don't think that's any argument.

13               MR. TAYLOR:  I'm not sure why my colleague tagged

14   that.

15               THE COURT:  Is it hard to take off those checkmarks?

16               MR. MARTON:  At this point it would be, yes.

17               THE COURT:  Normally I'd agree with you.  I don't

18   think it's a big thing, and so at the time I think we can just

19   let it go back.

20               MR. TAYLOR:  And I think if there's too much of it,

21   it has kind of a cumulative effect.  Here I guess the problem

22   we have is that we've got kind of the Court's claim

23   construction, and this takes it out of context.  I mean,

24   completely out of context.  You can have the instruction which

25   says what the construction is.  And to isolate this like this,

1    I think is not appropriate.

2              THE COURT:  The slides show any of that?

3              MR. MARTON:  Yes.  The slides show the entire claim

4    over and over.

5              MR. TAYLOR:  Why don't we just take these out?

6              MR. MARTON:  Because you lose context.  This is the

7    complete slide that was used, just we stripped the titles off

8    and any argument.  I think that you lose sense of what was

9    said.  This is just as a reminder of what the expert said

10   without argument included.

11       But I think if we remove that, it's just going to be a

12   confusing set of documents.

13             MR. TAYLOR:  But it's not the correct statement of

14   the law and it's not the correct evidence, and to have it go

15   back there as evidence that they can consider, I think it is

16   not appropriate.  I don't have a problem with this.  I have a

17   problem with where it leaves it out.

18             MR. MARTON:  The whole claim is right here, too.

19             THE COURT:  As long as it's there on that page and

20   highlighting that one part.

21             MR. TAYLOR:  Even as much as I know about

22   PowerPoints, I know this page can JUST be ripped off the

23   PowerPoint slide.  I know that.  And that would be an easy

24   correction.

25       And, again, I think to the extent that this is -- again,

1    I think that -- well, I have a problem generally with the

2    trash can, but -- can I ask my colleague to come up here?

3              THE COURT:  Sure.

4              MR. TAYLOR:  Aubrey?  I just want to make sure I'm

5    understanding what the objection is with this.

6              MS. HADDACH:  We are saying these ones are included

7    because they're impurities and they're saying they are not.

8              MR. TAYLOR:  The depiction of the trash can is very

9    heavily argument that I think is inappropriate as a piece of

10   evidence that should go back to the jury to the extent we are

11   trying to limit this to just evidence and what the

12   experts -- yeah, frankly what the experts said, I think that

13   is the issue and this wound up being -- kind of having a

14   cumulative effect of letting them have their argument

15   memorialized in their hands.  And, again, these parts are left

16   off, I mean, these slides can easily be taken out.

17        The same thing linear flame retardants.  I think when we

18   have a repetitive and a misrepresentation of what the

19   claims --

20             THE COURT:  The jury already understands that issue.

21   The chemists were split on that, they don't agree, and the

22   lawyers did a good job of highlighting it.  You've got a

23   distinct disagreement upon the chemists.  And they understand

24   it.  I think they understand the Defendants' position, they

25   understand your position.  I don't think it's going to confuse

1    anybody.

2        I mean, I understand your position.  Again, if we had

3    time, we would probably clean that up a little bit, make it

4    better.  But that's not going to confuse the jury.  I don't

5    think that's unfair prejudice.

6                MR. TAYLOR:  The last one.

7                MR. MARTON:  I thought we did just go through that.

8                MR. TAYLOR:  Again, this one I think, you know, with

9    the full -- again, this is really, really inappropriate, Your

10   Honor.  This is not evidence of -- I mean, this is --

11               MR. MARTON:  It actually is evidence.  It is his

12   conclusion that these match up.  It's like he said nothing if

13   he didn't say that.  And it's not argument.  It's the same as

14   Dr. Jacobs saying, I analyzed the fibers and they have within

15   them these compositional ratios.  Here he said, I analyzed the

16   prior art and it's the same as here.

17               MR. TAYLOR:  I just think it is fundamentally unfair

18   to let them have memorialized what their argument is as

19   evidence, and that's the problem.  We are memorializing

20   argument as evidence and getting it to the jury.

21               THE COURT:  No, that is evidence because he

22   testified to that.  So it is evidence.  It's just

23   memorializing that evidence.  This isn't just argument.  The

24   chemist testified to that, and that becomes evidence.  So it

25   is evidence.  You're just putting that now in a written form.

1          MR. TAYLOR:  In an argument form.

2          THE COURT:  Not argument, just a written form.  It

3    isn't saying anything that the doctors didn't say.  That's why

4    we usually just go back to just accuracy and no argument.  And

5    I understand the argumentative part of it, but that's he

6    testified to.  So that is evidence.  That reflects evidence

7    given in the case.

8          MR. TAYLOR:  Here's the problem.

9          THE COURT:  You are saying somehow the other part is

10   not evidence.  It is evidence.

11         MR. TAYLOR:  And I think there's a blend between

12   evidence and argument here.

13         THE COURT:  Yes.

14         MR. TAYLOR:  What we asked them to do is to remove

15   the claim chart, you know, check boxes.  That's what we wanted

16   them to remove.  They didn't remove that.  And I thought that

17   was the agreement yesterday, to have this here --

18         THE COURT:  Because, like you say, it's a mixed

19   thing.  That is evidence because that's what the doctor

20   testified to.  So the jury has that before them.  It is not

21   introducing anything new.  They have that before them.

22      And like I said, if we had the time, we could clean that

23   up and all of this would be a little cleaner.  But I still

24   don't see anything -- that's not introducing new.  You're

25   saying it memorializes it.  They've got -- how many pages of

```
 1    stuff are they going to have back there?  They have a lot of

 2    evidence.  I don't know that is going to cause any unfair

 3    prejudice.  You can argue the opposite.

 4            MR. TAYLOR:  Even in the volume that it's being

 5    presented?

 6            THE COURT:  Well, that's a concern.  I don't know

 7    how many of those you have.

 8            MR. TAYLOR:  It looks to be -- I don't know.  I'm

 9    going to eyeball this at 95 pages or so?

10            MS. HADDACH:  One of them is 58, one of them is --

11            MR. TAYLOR:  I think this is --

12            MR. MARTON:  They're just to give context with the

13    argument removed.  I don't think there's a meaningful way to

14    reduce the number.  And if it's too much for the jury, you

15    know, they'll disregard it.  That cuts against us.  You know,

16    the jury is faced with a lot of evidence in this case, and I

17    don't think --

18            THE COURT:  They have a lot.

19            MR. MARTON:  -- that there is a sound reason to just

20    cut it because it is so much.

21            MR. TAYLOR:  I mean, this is a bona fide objection

22    to it being cumulative and argumentative and I think 403.

23            THE COURT:  Well, no, you mean excluding the written

24    part of it?  Because the evidence is in.  It is evidence.  The

25    jury heard it.  They can ask to have it played back if they
```

```
1   needed to do that.  That's evidence.  That's before them.  I

2   just memorializes it in a written form, but it's memorializing

3   the evidence that was presented to the jury.  Nothing new,

4   nothing different.

5              MR. TAYLOR:  I guess the problem I have is at what

6   point does it become too much?

7              THE COURT:  Like I said, if we had some time to

8   clean it up, I would probably agree with you.  But I'd have to

9   go through every one of those to see how we're going to do

10  that, and I don't think ultimately it's that prejudicial to

11  you.  I understand your concern.  I don't think it's going to

12  be prejudicial.

13             MR. MARTON:  All right.  Thank you, Your Honor.

14             THE COURT:  Anything else?  We'll be making those

15  changes.  We'll be in recess for a minute.

16                        (Brief recess.)

17             THE COURT:  All right.  Counsel has received a copy

18  of the final draft of the charge.

19        Anything else we need to address before we bring the jury

20  in?

21             MR. WOO:  No, Your Honor.

22             THE COURT:  All right.  Bring the jury in.

23             (Whereupon, the jury entered the courtroom.)

24             THE COURT:  Ladies and gentlemen of the jury, good

25  morning.  We are ready to proceed.
```

1          I apologize for the delay, but we have been working on

2     getting this Court's charge to the jury finalized.  We were

3     able to do that.

4          I am going read it to you, and it is a lengthy one, so

5     just bear with me.  You don't have to worry about taking notes

6     or remembering it.  When you retire to deliberate, we will

7     have a copy for each of you to use during your deliberations.

8     It has a lot of jargon in it, technical stuff, and so we have

9     to give you the law, some explanations that you will use in

10    your deliberations and answering some questions that we are

11    going ask.

12         Once I finish reading this, you will hear closing

13    arguments from both sides of attorneys.  Plaintiff has the

14    burden of proof on its infringement part of the case, so they

15    will go first.  That probably will get us into the lunch hour.

16         We will take the lunch break, and then we will come back,

17    hear from Mr. Woo, and then the Plaintiff will finish up.

18    They get the last say for a few minutes.  And then after that,

19    you will be begin your deliberations.  So sometime this

20    afternoon, you will start deliberating the case.

21         We will have all of the exhibits back there for you.  We

22    will get them together and have them back for you to use

23    during your deliberations.

24              (Whereupon, the Court's charge to the jury was read

25              in open court.)

1          THE COURT:  At this time the lawyers are permitted

2     to address you in closing arguments.

3        Mr. Dain?

4          MR. DAIN:  Thank you, Your Honor.

5          MR. WOO:  I'm sorry, Your Honor.  My clients are in

6     the courtroom.  Do they need to be excluded?

7          MR. DAIN:  Yes.

8        Good morning, ladies and gentlemen.  I know your eyes are

9     already glossed over, and His Honor did a remarkable job.  It

10    is a long set of instructions.  It is kind of like the Bible

11    you will be taking back into the deliberation room.  And it

12    really is to make sure, if there's any question you have

13    regarding how you assess the boatload of damages -- I mean,

14    and evidence that we have given to you, that you look to here

15    and hopefully the questions will be answered.

16       But I'm going to be using this also as my guide to go

17    through the argument and tell you what the evidence has

18    proved.

19       So the first thing I want to do is, from the bottom of my

20    heart, I want to thank you for sitting here.  I spent a lot of

21    time sitting here.  Sometimes my eyes glazed over, too.  You

22    know, I would glance over sometimes and I cannot believe how

23    attentive you-all were to some of this evidence.  And it went

24    on and on and on, some of which I believe was unnecessary,

25    some of which I will explain to you why it had to be so

1    tedious as we go along.

2         So the first thing as His Honor explained to you, Kaneka,

3    our client, is claiming that UNO, JBS, and Jinny Beauty

4    Supply -- by the way, JBS and Jinny Beauty Supply, as you

5    heard from the evidence, two separate corporations, they are

6    owned by the same guy.  One imports the stuff; the other sells

7    the stuff in the United States.  But we are alleging that they

8    infringed our two patents.

9         So the reason we go first is we have the burden of

10   proving that to you.  And that is why we presented the

11   evidence first, and that is why the Defendants go second.

12        Our burden to you is to prove, as His Honor said, by what

13   is called a preponderance of the evidence, another long term

14   that didn't need to be in the lexicon but is.  And it really

15   means, as His Honor said, just more likely than not.

16        So we're not here to prove to you beyond a shadow of a

17   doubt that the Defendants did what we claim they did; just

18   that our case is more likely correct than the Defendants'

19   case.

20        And the truest example that is given all the time and you

21   have seen the scales of justice probably in pictures and

22   stores and movies, but it's just a scale.  Both parties start

23   out absolutely even.  We have the burden of going forward so

24   we put evidence on our side, the Defendants put evidence on

25   their side, and what you have to find out is if we tip that

1    scale even just the slightest, if we've done that, we have

2    proven our case that that it is more likely than not.

3         Don't get me wrong.  I don't believe we just barely

4    tipped the scale.  I really believe the evidence is strong on

5    our side that the Defendants have infringed the patents.

6         But that's our burden.  And the reason is the patent is

7    presumed valid.  That's what we start with.  And so the

8    Defendants, on the other hand, have a stronger burden.

9         So when you were hearing from their experts that the

10   patent is invalid because there was these other patents

11   before, that there was a Toray book and all that other stuff,

12   they have to carry their burden by a much higher standard.

13   And as His Honor said, they've got to show a high probability

14   that the patents are invalid, by clear and convincing

15   evidence, so-to-speak.  So it's not just tipping the scale.

16   The scales better go this way (indicating) for their case.

17   And that's how it starts out.

18        So we prove the infringement and the damages.  They have

19   to try to prove to you the invalidity.  And what the

20   Defendants have chosen to do in this case is not pick -- the

21   Defense did not pick their battleground.  And I may use a lot

22   of homilies, some of which some of you may not understand,

23   but -- I don't know where I got them from, but it's called to

24   me throwing spaghetti against the wall or firing a shotgun.

25   You're just shooting at everything and hope you hit something.

1        And so their defense is, as we started out, well, we

2    didn't copy what you did.  But if we copied what you did,

3    we're not infringing what you did.  And if we're infringing

4    what you did, well, what you did was an invalid patent.  And

5    it's invalid because you either didn't explain it well in your

6    patent or, sure, you explained it well in your patent, but it

7    was so obvious anyone could have figured it out.

8        So they have just thrown everything out there and are

9    hoping something is going to stick.  But as you go forward,

10   keep in mind we only have to prove to you it's more likely

11   than not.  They have to prove to you the other way around,

12   that it's highly probable from their end.

13       So let me start out.  You've heard the evidence of what

14   our clients did, how they start out from the premise they were

15   already selling fibers for artificial hair--the modacryl

16   fiber, the PVC fiber.  And there's one theme you'll see

17   throughout this that just goes throughout everything they do.

18   Our client will only sell artificial fiber if it's flame

19   retardant.

20       Our fiber -- our client is looking for safety from day

21   one.  What's out there in the market that other people sell,

22   and that included UNO, was a fiber that was flammable.  In

23   fact, I remember Dr. Ellison, I made the mistake of asking

24   about PET and I meant to say PVC.  I might have said PET, and

25   he said, well, that's flammable.  And he knew right away.

1          So the point is our clients started with the premise that

2     we know there are a lot of fibers out there on the market.  We

3     want to make a fiber that is flame retardant like ours but

4     just has better qualities.

5          And the problem they face was any time you add something

6     to that fiber, you're going to dull it, make it heavier, maybe

7     make it stickier, and it won't comb well.  That's the dilemma

8     they face.

9          And I may get into it in a little more detail, but this

10    is the frustrating thing we had with the experts.  And you

11    have to sit here and, you know, these are a lot of smart guys.

12    I'm not doubting the three guys on their side were smart.  I

13    wasn't going after them because they were smart.  I was going

14    after them because they were coming at this problem from an

15    entirely different prejudiced angle from their views.  And

16    here is why.

17         And by the way, the Defendants also try to pick apart,

18    they deconstruct every little part:  You didn't invent flame

19    retardants.  Of course we didn't.  You didn't invent

20    artificial hair.  Of course we didn't.  We were already

21    selling it.  It was already on the market.

22         What is unique about this is you put these combinations

23    together and you get this great result, this particular thing.

24    That's what Dr. Jacobs said.  And so what the Defendants'

25    experts, when they come up here, they say, well, it's just

1    obvious.  You know, now in hindsight, it's just obvious.

2        And I can't tell you how many times it has happened to

3    me, and I know it has happened to you, and the reason I know

4    this is because when you walk in this courtroom, you have to

5    leave aside a lot of things, but you don't leave aside your

6    common sense.  And if there's one thing we know:  You can be

7    the smartest person in the world, but if you don't have common

8    sense, your opinion isn't worth a lot.  And that's the problem

9    with their experts.

10        And so here is what they said.  I will just take them

11    down.  Dr. Ellison:  Fiber is fiber, it doesn't matter, stick

12    a mop on your head.  He actually said that, stick a mop on

13    your head and that's all this patent is about.

14        Dr. Spiegelberg, Dr. Grayson:  Oh, there is nothing new

15    about this thing, you could have put it together, we tested

16    it, ours is completely different.

17        Here's the problem with what they were doing and why they

18    didn't have common sense in the approach.  We're talking about

19    an artificial hair fiber, not a carpet, not stuff that goes

20    into making plastics, not mops, not clothing--artificial hair

21    fiber.

22        So you have to start from the premise of who -- Kaneka,

23    UNO, who are these people?  They're not scientists that are

24    dealing with computers.  They aren't chemists that are dealing

25    with carpet.  They are chemists dealing with artificial hair.

1      None of their experts approached it from that view.  To

2   them, a fiber is a fiber whether it's in this field, it works

3   in this field.  So they approached it from that angle.

4      The other thing and the reason we had one expert for you

5   Dr. Jacobs is he was the only expert that had experience with

6   flame retardants.  Do you remember that?  We asked every one,

7   Dr. Spiegelberg, Dr. Grayson, Dr. Ellison.  None of them had

8   any specialty in flame retardants.

9      And why is that important?  If you listen to the

10  testimony of the experts, if you stick a flame retardant in

11  the plastic that goes into making the frame of your TV or your

12  computer, you don't care whether it has brilliant cover or

13  comb it or touch it, it has luster.  You just don't want it to

14  burn.  Right.

15     And that is what the Defendants were thinking this was

16  all about.  One flame retardant and another flame retardant,

17  what does it matter?  They were coming at it from the point of

18  view, well, they all retard flame, they all keep it from being

19  flammable, so they are all the same.

20     The reason Dr. Jacobs was here is he got it.  He got that

21  you have flame retardants that you want in computer terminals,

22  in carpets, in clothing.  And some of us remember in the '70s

23  how we went through this whole thing with children's clothing

24  that was being imported that would just explode if you got

25  near a flame.  So you add a flame retardant to that.

1    But do you want to bet that even then the people dealing

2   with clothing had to find just the right flame retardant?

3   There are halogen flame retardants, toxic.  Do you want your

4   child that gets near a flame to be poisoned because of the

5   fumes?  So they went through that same kind of a thing.

6    But that is why Dr. Jacobs was here.  He actually worked

7   with human hair so he knew human hair, he knew flame

8   retardants, and he was a polymer chemist just like they were.

9   But even more so, he had worked in the industry, so he knows

10   what happens in the real world, not what happens with your

11   graduate students and your professors and your interesting

12   projects in the lab.  He knew how things worked in the real

13   world.

14    So what they are coming at it from is everything looks

15   obvious in hindsight, everything looks simple in hindsight if

16   you can take from one field and apply it to another.  And what

17   Dr. Jacobs is saying is that people who work in plastics and

18   molding and TVs and carpet, they don't know what goes on with

19   human hair.

20    So when Dr. Ellison says, well, color is color, no, it's

21   not.  I'm looking at this carpet.  And don't get me wrong, my

22   daughter has actually probably had the color of this carpet at

23   one time in her hair or not.  But what I mean is it's

24   different to say you can color a carpet than you can color

25   hair fiber.  It's different to say that you can color a

1    computer screen or a computer case than it is a hair fiber.

2        So we have to start from the premises, when our clients

3    were deciding how to make this new and improved fiber, they

4    weren't looking at -- for guidance in the field of art of what

5    might protect a computer from melting.  When they come across

6    the Toray patent, they go, yeah, it's the same flame

7    retardant.  Well, gosh, you can buy that flame retardant

8    literally at Home Depot.  It's a flame retardant.  You can add

9    that flame retardant to anything.

10       So if you see in a book it says, well, you can take this

11   flame retardant and add it to a PET fiber, which as you heard

12   can go into water bottles, it can go into anything, it's

13   ubiquitous.  So when they see that, that doesn't guide them to

14   say, look, maybe it will make the color better on the hair,

15   maybe it will make the luster better, or maybe make it comb

16   better.  That is the farther thing from their mind.

17       All they are looking at, just like all UNO was looking

18   at, is what are the flame retardants out there?  I just want

19   to get an idea what's out there, and then we'll start

20   experimenting.

21       And have you ever -- I mean, I watch them all the time,

22   but have you ever watched the shows like Law and Order or CSI

23   or any of those?  Detective work sounds really great like

24   within an hour you figure everything out, you know.  If you're

25   investigating, you walk up to two doors, at the second door

1    you find a guy.

2        What really happens with police work is you go

3    door-to-door, day-to-day, hour-to-hour, month-to-month

4    sometimes, and you have to interview hundreds of people before

5    you find the information that you go, aha, I get it.

6    Unfortunately, you can't put that together in an hour.

7        So when Dr. Ellison or Grayson or Jacobs (sic) are up

8    there going, geez, I don't know why you didn't figure this out

9    in 15 minutes, it's because true inventions come from

10   experimentation.  You just start with something, that doesn't

11   work; go to the next one, that doesn't work.  You keep going

12   down the line and eventually you might find something that

13   works.  And you may have an aha moment.

14       And if you remember what happened is for a year, one

15   year, Kaneka started out with a PET fiber alone and said, "Can

16   we do things to it to make it flame retardant?"  And after a

17   whole year, what did they find out?  You light a match and

18   poof, we're nowhere, it's still not working.

19       So then they said, okay, let's shift and add a flame

20   retardant to this.  But what the first thing they looked at

21   was, well, we have got these things called halogenated and

22   non-halogenated.  And halogenated, unfortunately most of them

23   are extremely toxic.  They're poisonous near humans.  So they

24   pushed that aside.

25       So think about this.  Something being so obvious, when

1    you say that you can add a halogenated flame retardant to a

2    computer screen, that's not going to guide you to say, I want

3    to add it to hair because, first of all, it's probably not the

4    safest thing; and, second of all, that's not going to go up if

5    it lights near your head and poisons you immediately.

6        So that isn't the first thing they even looked at.  They

7    went right to these non-halogenated flame retardants, and they

8    spent three years going through that.  That's the kind of

9    detective work you do when you're going to try to invent a new

10   hair.

11       And, by the way, they looked at what UNO had.  Sure.  PET

12   fiber.  Big deal.  Everybody knew about PET fiber.  They

13   didn't copy their fiber.  But they did what even the Defense

14   experts did--look at everything in the field.  They wanted

15   something better.  They were going to improve on that.

16       So they went through three years.  Now, you remember

17   that's 1999.  Now we're into 2003, four years.  And Mr. Masuda

18   said they got nowhere with those.  The only one that they got

19   close on this phosphorus one, they couldn't get.  And if you

20   look at the exhibit and I don't remember the name of it, but

21   it's in there where he says they won't supply it to them, may

22   not supply it to them because there isn't a quantity.  They

23   may not supply it to them because it's toxic.  The bottom line

24   is, they couldn't use that.

25       So then he said, well, let's see if there are any of

1    these halogenated ones that are normally toxic and see if we

2    can find any that aren't.  That's what led them to the

3    brominated epoxy flame retardants.  And if you remember his

4    testimony, even most of those didn't work.

5         And so here is the aha moment just like a detective could

6    have when they are investigating, that he said, well, what if

7    I take the refractive index of one and match it with the

8    refractive index of the fiber.

9         And I know some of you are wearing glasses, and I wear

10   glasses mostly too for distance.  But when you shine light

11   through something, just like glasses it bends.  And so that

12   whole idea behind far and nearsighted, you curve your glasses

13   in a way so it comes in and bends just the right way to get

14   into your eye so you can either read or you can see better at

15   a distance.

16        But it also has -- light refracts off of anything that

17   has translucence.  If you have seen any light going into the

18   pool, it curves.  Hair does the same thing.  So Mr. Masuda

19   said, wow, maybe if I find a flame retardant that has the same

20   refractive index as the PET fiber, then I won't dull it.  At

21   least I'll get the same good color.  That's kind of what he

22   was looking for, add a flame retardant but get the same kind

23   of color.

24        That's what led him to finding this particular brominated

25   epoxy flame retardant.  Did he invent it?  No.  He found it in

1    a catalog.  What catalog is it in?  The Toray catalog.  The

2    Toray catalog had all the flame retardants.  So he just buys

3    an off-the-shelf flame retardant that he got out of the Toray

4    catalog essentially.  I don't know if he got it from that or

5    from another, but it's the same flame retardant.

6        And then when they put it together, lo and behold, it

7    does not just keep the color the same, it enhances the color

8    and it enhances all these other features.  It has these

9    surprising, unexpected results.  That's the invention.

10       Now, we're not talking about, you know, a medicine that

11   saves the world.  We're not talking about rocket science.

12   We're just talking about chemical science for the making of

13   hair.  But in the hair industry you can get a patent.  If you

14   came up with an invention, you can get that patent.

15       And it's a competitive industry.  And if you spent four

16   years with three scientists on this particular project and you

17   spent all that time and you came up with this unique fiber

18   that you call Futura, you can then apply for a patent.  And as

19   you see, what they called the priority date is July 25th,

20   2003.  It's when they first applied for their patent.

21       And when they first include what their invention is.  So

22   you can pick apart -- Did they pick apart the PET fiber?  No.

23   Did they invent the flame retardant?  No.  Were those two

24   things known somewhere?  Yes.  But when you put them together,

25   the reason--and you heard this from Dr. Ellison; he admitted

 1    it--the patent office gave them the patent is because it

 2    achieved unexpected results.  It wasn't just sticking a flame

 3    retardant on a hair fiber and get flame retardance.  They have

 4    got all these other things.  If you took a flame retardant and

 5    all they did was just keep the thing from being inflammable,

 6    big deal.  Everyone had that.  So they got this patent because

 7    of unexpected results.  And UNO, then, copied that.

 8         Once Futura begins selling -- And I will show you the

 9    document in a minute, but I am sure you remember it.  Futura

10    was selling sometime in early 2004.  Mr. Kim gets one of these

11    samples.  He tells Mr. Lim, "Find out what is in them."

12    Mr. Lim gets it, tested it, they find out what is in it, and

13    guess what.  Within a couple of months they have a product

14    called Natura, and it has the identical features.

15         Well, here is the risk you run.  You can copy anyone you

16    want out there.  You can -- You know, people copy all the

17    time.  If Madonna has a song out, Lady Gaga can copy that,

18    except for one problem--Madonna owns the rights to it.  So if

19    you copy it, you have got to pay for it.  You have got -- If

20    you are selling, you have got to pay profits or you have got

21    to pay a royalty.  That is just the way things work in

22    business.  The same thing.

23         That is the risk UNO ran.  There is no patent issued yet,

24    but they chose to copy it, and they used the exact same

25    formula.  And they can argue all they want that they came up

1   with this on their own, but as the Judge instructed, there are

2   two types of evidence.  There is direct evidence and

3   circumstantial.  You always hear this:  "This is just a

4   circumstantial case."  They are equally as good.  And most

5   cases, in fact, are proven by circumstantial evidence.  Very

6   rarely does someone say, "I did it."  That is just the nature

7   of the beast.  So you usually prove it by "Let's look at all

8   the documents, what they say, we heard what you said,

9   Mr. Lim--'I didn't copy this thing at all.'  Let's look at the

10  document we have."  And from the document Mr. Lim had, the

11  first thing on his list is "UNO, get Kaneka's product."  First

12  thing.  He tried to explain, "Well, we were doing all this

13  research before," but I will tell you, he would have put that

14  on there.  So that is the first thing.

15      Then the next thing is he is testing stuff.  And first

16  you heard he testified in the deposition, "I was testing other

17  things."  Now suddenly he says now, "I was testing the same,

18  by chance, brominated epoxy flame retardant Kaneka had.  I

19  just -- but it had nothing to do with Kaneka."  But when he

20  showed the new documents he came up with it, looked like he

21  was paying for it before he was even proposing buying it.  He

22  didn't list either of those on his report as having been done.

23  So the bottom line is they copied the thing.

24      So now that is all.  They are at peril that they may have

25  to pay for it.  It is the business.  That is the risk you run.

1    As the judge instructed you, he is not punishing them.  You

2    just do that in business, you run that risk.  So now Kaneka

3    has already applied for a patent.  The first one in 2003.

4        So now we move ahead, and in the meantime they are both

5    selling this competing product.  And as you heard from the

6    evidence and from the documents, UNO is going to China, they

7    are checking with the wig manufacturers what the demand is for

8    this fiber.  You heard that from Mr. Jhin at Jinny and JBS.

9    He didn't want to get sued from products -- for personal

10   injury, so he wants a flame retardant fiber.  So there is a

11   demand for this thing, the sales are increasing, they are

12   selling hundreds of tons of these things, but it is something

13   they copied.

14       Now, in July of 2010, kaneka's patent issues, and it has

15   exactly, exactly the formulation, the recipe that they had

16   originally come up with.  And Kaneka didn't wait.  It filed a

17   suit against UNO and JBS and Jinny and said, "You took your

18   chance.  Now you just have got to pay us for it."  And that is

19   what this case is all about.

20       So in terms of infringement -- And I want to go down the

21   list of the instructions that the Judge has said, and some of

22   these -- one of the things we did, and I know you don't think

23   it was for the convenience for you, but the case probably

24   would have lasted another week.  For the love of God, I know

25   you wouldn't want that, but it would have lasted another week

1    if we just proved infringement first and waited and let them

2    prove invalidity, so when we had Dr. Jacobs up here, he just

3    talked about both things.  When we had witnesses, they just

4    kind of talked about everything so we could kind of shorten

5    this and not have it more like a tennis match rather than we

6    throw everything in on their side and wait until they throw it

7    back.

8         But one of the things that came up in this is what was

9    presented to the patent office.  And any time someone applies

10   for a patent, two things happen.  The patent office does its

11   own examination.  And you saw the video.  The patent office

12   has examiners that are skilled in the art.  I can't for the

13   life of me understand why Dr. Ellison, who is opining on what

14   the patent office would have done, he didn't even know or

15   wasn't told what they do.  He didn't even know as much as you

16   know, because you saw the video.  The patent office has

17   chemists that understand these formulas, understand these

18   processes, maybe every bit as smart as Dr. Grayson and

19   Spiegelberg and Ellison were.

20        And the first thing is the Judge instructed you they

21   review the application.  In examining the patent application

22   the examiner reviews certain information about the state of

23   the technology.  And remember what I talked about the

24   technology.  The patent examiner is going to look at the

25   technology involving hair fibers.  They are not going to look

1    in other fields of art.  Why are they going to look into

2    computers?  They have other departments that do computers.

3    Why are they looking at plastic injection molding for carpets

4    and cars and other things?  That is other fields.  So they are

5    going to look at the state of the technology.  And they are

6    going to search for and review information that is publicly

7    available.  They are going to do the same thing Dr. Ellison

8    did.

9         And I have got to tell you one other side thing.  You are

10   going to be swamped with exhibits when you go back to the jury

11   room, and the reason is all those slides that you saw in

12   opening statement from the Defendants, 50 slides, and the

13   hundred slides that Dr. Spiegelberg did, the hundred slides

14   from Grayson and Ellison did, they are all going back there.

15   If you want to look at them, bless your hearts.  I don't ever

16   want to see them again.  But that is all going back there.

17   Thankfully, this isn't (indicating), because you would be

18   there for a year trying to go through all of these documents.

19        But what you did hear from Dr. Ellison is that all that

20   searching he did, all he came up with is 26 pieces of prior

21   art.  All the millions of patents out there, and he could only

22   find 26 that he thought were relevant; 16 of which the patent

23   office also considered.

24        Now, the patent office does its own review and, of

25   course, Kaneka gives the patent office what it thinks is

1   relevant.  You don't give the patent office 100,000 patents

2   and say, "Go fish."  That is even worse.  You give them what

3   you think is relevant, knowing the patent office will also do

4   their own search.

5       Nowhere in there does the Toray patent come out.  The

6   Defendants say, "Oh, it is because you were hiding it from

7   them."  No.  The patent office would have found it the same

8   easy which anyone else did.  It wasn't relevant to them.  As

9   Dr. Jacobs said, it is in a different field.

10      Dr. Ellison admitted on the stand the most important

11  piece he could find, the one he thought was his strong piece

12  of evidence, Kaneka gave that to the patent office and the

13  patent office rejected it; said it has to do with other

14  stuff--carpet fiber.  It is not hair.  We are looking for

15  stuff that has to do with hair and has to do with flame

16  retardance related to hair.  So the patent office does its own

17  review and rejected the best piece of prior art in all of

18  these exhibits that Dr. Ellison had.  That is it.  All this

19  combination is everything.

20      The best thing he could give you this Dainippon Ink

21  patent.  The patent office said no.  So that is just out the

22  window.  So this whole issue there wasn't prior art that the

23  patent office didn't consider.  They considered everything

24  that was important to them, and they rejected those arguments

25  and they granted the patent.

1          The other thing that is important in examining the

2    infringement is what the Judge called claim interpretation.

3          And Michelle, if you could put up claim 1.

4          And you have seen it a zillion times.  And by the way, I

5    don't know if we have it here, but somewhere around here are

6    the original patents, Exhibit No. 1 and Exhibit No. 2.  You

7    will have those back, the ones that came straight from the

8    patent office.

9          The reason this is important, as I said about the

10   spaghetti on the wall or the shotgun, Defendants are making

11   this argument that there isn't what is called a written

12   description in the patent that really explains what is in

13   claim 1.  But on the flip side they are saying, "Oh yeah, we

14   can't figure out how to make it by your patent, but then your

15   patent is really easy so anyone could have made it."  So they

16   are making these two inconsistent arguments.  You will have

17   the patents back there and you can look to your heart's

18   content and see it is all there.  The written description,

19   everything is in there, as well as the claim.

20         But if you look at claim 1, it has all this chemical

21   language.  But the only thing that we are fighting over here

22   is about this -- where you see a brominated epoxy flame

23   retardant?  You see that part?  This is where the big fight

24   became.  And that is why we went out and got the only polymer

25   chemist that has knowledge of flame retardants, so he could

 1    tell you about that.  And what happened is these experts came

 2    up with all of their big reports without thinking that they

 3    are going to have to deal with how that part of the claim is

 4    construed by the Court.

 5         The Court has to explain to you what we are talking about

 6    when we are saying this 5 to 30 parts of a brominated epoxy

 7    flame retardant--what does that mean in the real world.  And

 8    so the Court construed that claim, that portion of the claim,

 9    and so this 5 to 30 parts of weight of a brominated epoxy

10    flame retardant includes impurities ordinarily associated with

11    polymer chemistry related to flame retardants.

12         And I don't know if we have one of the documents that

13    actually has the construction within it.  If you could find

14    it.  Why don't we go to page 14, then, of the charge.  That

15    might help.  So blow up "In claim 1."

16         Okay.  So here is what His Honor read to you.  "A

17    brominated epoxy flame retardant means 5 to 30 parts by weight

18    of"--and this was a big fight.  If you watched their experts,

19    they only underlined this portion--"linear tetrabrominated

20    epoxy flame retardant."  You know why this is so silly.  They

21    didn't need to spend all this time, all this money, and all

22    these reports.  Linear tetrabrominated epoxy flame retardant,

23    all of these tetrabrominated epoxy flame retardants are

24    generally linear.  They are a long chain of those little

25    molecules.  They are like a long pearl bead necklace that is

1    unhinged and you just lay it on the table.  It is pretty much

2    what it looks like generally.

3         The reason that this had to be construed is because we

4    are talking about the real world.  This is not created like

5    Intel creates chips for computers in these clean rooms with

6    gowns and everything and arms sticking through machines

7    covered in gloves so you don't get the slightest bit of

8    imperfection.  This is just dealt with like normal

9    manufacturing.  You buy the flame retardant in quantity, you

10   mix it up, make it into pellets, mix it up with the PET fiber,

11   heat it up, and stick it through kind of a glorified -- they

12   call it a shower nozzle or, you know, spaghetti machine, and

13   outcomes a long fiber.  That is in the real world.

14        So what happens is the Court construed it to include

15   impurities ordinarily associated with polymer chemistry

16   related to flame retardants.  That is why Dr. Jacobs was so

17   relevant and that is why their experts weren't.  They don't

18   know about the polymer chemistry related to flame retardants.

19   All they want to tell you is that it has got to be linear, a

20   linear tetrabrominated flame retardant.  And that is how they

21   normally start out.  What Dr. Jacobs is trying to say is when

22   you get this stuff from the factory, it always has impurities.

23   That is the reality.  We don't live in a perfect world.  And

24   those impurities mean -- if you look down below.

25        If you can blow up that chemical structure.

1    See this thing off to the right that says OH?  Everybody

2    has heard of H2O--water.  Oxygen with two hydrogens on it,

3    that is what makes water.  It gives life and everything.  If

4    you just have OH, it is called a hydroxyl.  And what happens

5    is that molecule wants to find something to stick to it, like

6    a hydrogen, so it is stable and it is just like water.  So in

7    the real world occasionally you are going to get something

8    that attaches to that, some impurity that is mixed within the

9    chemicals you are getting.  And so you might have this bead of

10   pearls that occasionally is going to have a branch.  And what

11   we are talking about here is 30 to 150 of these pearls in a

12   single chain.

13       And here is where the big fight is, and this is why it is

14   so silly.  Dr. Jacobs knows what happens in the real world.

15   All the stuff you get of those 150 beads, one of these, maybe

16   even two, of the pearls might have an impurity on it.  It

17   might have something attaching to that OH.  And what

18   Dr. Jacobs was saying is if you had a hundred of those chains

19   out there, you might have 50 that had nothing; just nice

20   chains.  The other 50 might just have one little imperfection.

21   And that is what he was saying.  That is why -- He is

22   consistent with what the Court's construction is.  He is

23   telling you it is just an impurity.  It didn't change making a

24   fiber.  The fiber comes out with all these great qualities.

25   It is just an impurity that is normally, ordinarily associated

1    with polymer chemistry related to flame retardants; not these

2    other experts who are just telling you, "It has to be

3    absolutely perfect."  I don't know what world they are working

4    in.  They are not working in the real world, because you

5    wouldn't get anywhere in that world.

6         So that is what Dr. Jacobs is telling you.  So you line

7    up those hundred pearl necklaces, put them out there, and this

8    is what the Defense is telling you.  "Well, if there is an

9    imperfection in any of those pearls, one pearl on each chain,

10   threw them all out.  Throw them all out.  You got nothing."

11   And that is why they are saying they don't infringe.  "We

12   don't make this stuff because ours has a branch there, and it

13   is not an impurity.  It is something we somehow manufacture

14   into the thing."  But they did no tests to prove that.  And

15   Dr. Jacobs who worked in the field knows that.  So what

16   Dr. Jacobs is saying is, "Yeah, you might have an imperfection

17   in one of the pearls on your necklace, but we are not throwing

18   that necklace out because we are not -- you know, with respect

19   to that, this still makes these hair fibers work."

20        So that is why he is saying there is only one to two

21   percent maybe.  Because if you take all the beads in a pearl

22   necklace, you add them all up, it is one to two percent that

23   are imperfect.  They are saying if you have any imperfection

24   in any of these chains, you got nothing; nothing at all; you

25   throw the whole thing out.

1    And I don't want to equate this to pearls, but I

2    guarantee you if I had a hundred pearl necklaces and it

3    important to me that I needed those necklaces, I am not

4    throwing them out because one bead on each one is imperfect,

5    and that is what they are doing.  That is the kind of

6    ridiculous argument they made.  That may work in whatever

7    field they are in, but it doesn't work in the field of flame

8    retardants and hair fibers.

9        Now, there is even more that guides you to show that

10   there is infringement here and that we are right and they are

11   wrong, and that is --

12       If you pull out of that for a second, Michelle.  And go

13   right below it and highlight that.

14       And here is -- This is the law as charged to you.

15       Just that one paragraph at the top.  There you go.

16       "In claim 1 of the '429 Patent and claim 1 of the '430

17   Patent, the term 'impurities'"--so now you know that

18   impurities are just those ordinarily associated with making

19   flame retardants--"means those deviations normally associated

20   with the component of a claim."  Now, the component of a claim

21   is the flame retardant.  So it is just deviations.  What are

22   these branches but deviations.  That is all.  You heard

23   Dr. Jacobs say these things are essentially linear.  But they

24   have deviations.  They are imperfections.  They are

25   impurities.

1          And then it goes on to say "...by one of ordinary skill

2     in the art."  And, again, I have to say this.  Do you remember

3     the long exchange I had with Dr. Ellison where he just even

4     wouldn't admit that someone of ordinary skill in the art would

5     be somebody who knows something about hair and making hair

6     fibers?  He just fought, fought, fought, kept saying fiber is

7     fiber.  He wouldn't admit it.  Well, the reason this is so

8     important is, if you are going to understand what is an

9     impurity with flame retardants and hair, and if you are going

10     to understand what is a deviation, you ought to have some

11     sense of what someone in skill in the art would think of it.

12     And so we have got an instruction on that, and His Honor read

13     that to you.  And if you give me a moment, I will find it.

14          MR. TAYLOR:  Page 30.

15          MR. DAIN:  Thank you.  I knew someone smarter than

16     me would find it.  Page 30.  And so we will turn to that.  And

17     that is not it.  No, it is ordinary -- "Person of ordinary

18     skill in the art."  Is that page 30?

19          While he is looking for that, let me tell you what

20     happened.  All the experts opined early on in this case in

21     their reports about what a person of ordinary skill in the art

22     was.  And the reason that was important is because if we are

23     making these fibers and then we are looking for what might be

24     in the prior art, you ought to pick someone of skill in the

25     art.  You are not picking me.  You are not picking somebody

1    who, you know, makes -- you know, that is a painter.  You are

2    not going to pick them.  You are going to find someone in this

3    kind of field and this kind of art and say, "What would they

4    be looking for and what do they want?"  And as the Court read

5    it to you, it covers having, you know, a degree in polymer

6    chemistry and knowing about fibers and how to spin fibers and

7    how to do all that.  And then the very last thing it says is

8    about making the fiber so that it would appear like normal

9    hair, like regular hair.  So someone of the skill in the

10   art --

11        And did anyone happen to find it?

12            MR. TAYLOR:  Page 35.

13            MR. DAIN:  Page 35.  And I guess I don't understand

14   it.  Dr. Ellison wouldn't --

15        There we go.  "Level of ordinary skill in the art."  Blow

16   up that.

17        He wouldn't admit to anything.  You know, Dr. Jacobs, do

18   you remember -- this is -- You are going to gauge the

19   credibility of witnesses.  What you are going to have to

20   decide is if I call their experts' positions ridiculous, that

21   is me, but you have got to decide if you agree with me.  But

22   Dr. Jacobs turned to you and said, "When I first would have

23   looked at this, I might have thought it was simple, too,"

24   because hindsight is just so easy.  You sit there and  go,

25   "Man, I could have figured that out.  I could have invented

1    that."  Well, yeah, you are doing it after the fact, not

2    before.

3        But here is a level of ordinary skill in the art.  "The

4    parties agree"--and you remember you go through this whole

5    thing about what they have, and then look at the bottom part.

6        If you could highlight "In addition," and go all the way

7    down with that.  "In addition, the person of skill in the art

8    would be familiar with the principles of forming and treating

9    spun fibers, such as additives"--like flame

10   retardants--"dying, colors, surface treatment, drawing and

11   crimping"--and here is what Dr. Ellison just flat out wouldn't

12   admit, even though it is the law, he has got to agree to

13   this--"in order to obtain a fiber with the properties of human

14   hair."  So if Dr. Ellison tells you a fiber is a fiber, he is

15   just thumbing his nose at the instruction you have got to work

16   with.  How did that help you?  How does it help you for him to

17   say, "Stick a mop on your head and that is it.  This is

18   ridiculous.  It could be any fiber."  He knew what the level

19   of ordinary skill in the art was.

20       And then when Dr. Jacobs got out there and the Defense

21   cross examined him and said, "You agreed to what this was,"

22   and he said, "Yeah.  We are looking, you know, generally in

23   the field of making artificial hair."  Why are we here.  We

24   are not here for any other reason but to talk about patents

25   that were made in order to obtain a fiber with the properties

1    of human hair.  Now, I mean, the whole idea is make this as

2    close to the qualities of human hair.

3        So any time you are looking at infringement and we are

4    looking at these branching--not branches; all that big

5    fight--Dr. Jacobs was right.  He knows flame retardants.  This

6    flame retardant is going to have branching occasionally.  Big

7    deal.  But like I said about those -- Remember you put 100 of

8    those chains, those necklaces?  Their expert got up there and

9    said, "Well, if there is a branch in one pearl in each of

10   those, or in 84 of those, 84 percent branching, oh, it is

11   highly significant."  Dr. Jacobs is saying it is one to two

12   percent.  He is right.  It didn't change the qualities.

13       Kaneka was able to make a fiber to house these beautiful

14   qualities with an over-the-counter flame retardant that they

15   purchased.  And that flame retardant is going to be generally

16   linear in tetrabrominated epoxy flame retardant with

17   deviations, as the Judge has instructed you, are normally

18   associated.

19       Now, the Defendants are going to get up there, and here

20   is the thing to make this further complicated.  UNO is in

21   Korea.  How did they avoid directly infringing?  Selling their

22   fibers into the United States.  Right?  That would be directly

23   infringing.  That is why we have JBS and Jinny here.  They

24   say, "We sell them to China.  Clueless what happens after

25   that.  And then China sells the wigs into here, so we are

1    scot-free.  You can't get us."  Well, the law has this thing

2    called inducing infringement.  So if you are the person that

3    puts in motion this infringement and you know at every step

4    there is going to be infringement and you are encouraging--you

5    may have heard the terms like aiding and abetting--if you are

6    encouraging that infringement actively, you are on the hook.

7    You, too, will be on the hook.

8        So what makes it difficult is we can't get the

9    information from UNO, because UNO is in Korea and UNO is going

10   to say, "Oh, we don't know what the sales are.  We have no

11   clue."  And then you remember they put poor Mr. Burns on there

12   who made that slip.  And I don't know if he was turned away

13   from you, but if you can see how many, you know, facial

14   expressions he made after he made that slip of saying -- I

15   think I asked him, "Did the sales increase in the United

16   States?"  And he said, "Oh, no, I talked with Mr. Kim and he

17   actually said they decreased."  And so I asked him, "Well,

18   wait a minute.  Didn't you just say that Mr. Kim told you he

19   didn't know what the sales were in the United States?"  And he

20   couldn't answer.  And the reason is UNO knows what is coming

21   into the United States.  They are just not giving it to us.

22   We have to pull those teeth out of their head.  UNO knows they

23   copied this thing.  UNO knows they are sending it to China.

24   UNO knows it is coming in the United States.  UNO knows it

25   matches every single element of claim 1.  They just think by

1    insulating themselves through these Chinese wig manufacturers

2    that you won't find them liable.  But they are liable and they

3    are inducing infringement, and here is how it works.

4        The first thing you have to decide is do all of the UNO

5    fibers infringe?  And as I told you, the only fight they

6    really have is over that impurities one.  If you agree with

7    us, then their fiber infringes.  It is flat out that easy, if

8    you agree with us.  They may put up -- I don't know what other

9    stuff they will come up with now.  In fact, at one time they

10   tried to say they only had three bromines instead of tetra,

11   which means four.  By the time they got up there -- the

12   experts got up there and testified, they had gotten rid of

13   that because Dr. Jacobs had already put the light to that.  So

14   that is the real fight.

15       So if you agree with us on that, then their fibers

16   infringe, and so then we get to what the Judge said is

17   Question No. 1.

18       And if you can put that up.  That is on page 18.  And

19   blow up the top part.

20       And if I look at my watch occasionally, it is not because

21   I want to get out of here.  It is because I have got limited

22   time and I want to make sure I am not running over on your

23   time.  But it says, "Has Kaneka proven that it is more likely

24   than not"--more likely than not.  Remember just to tip that

25   scale a little, although I would love for you to say we rocked

1    that scale but--"that every requirement of claim 1 of the '429

2    Patent is included in the following product."  Okay.  Every

3    requirement.  Every one of their fibers was tested by our

4    expert Dr. Jacobs.  Every one of their fibers had -- They may

5    have different formulations.  It is the same thing.

6        Mr. Lim gets up here and goes, "We triple compounded this

7    thing."  You know what they did?  They bought the same flame

8    retardant we do, and then they kind of dry it out into a

9    pellet, melt it again, dry it out into a pellet, melt it

10   again, and then they melt it in with the fiber and somehow

11   that is magic.  Dr. Jacobs says, "It doesn't matter.  I tested

12   the stuff and it is all the same."  You might get a little

13   more branching at the end, but remember the branching is the

14   chemistry ordinarily associated with processing the flame

15   retardant.  I don't care how many processes you put it

16   through.  They didn't purify it.  It still has the same

17   impurities.  They just melted it a bunch of times.

18       So "...that every requirement in claim 1 is included in

19   the following product"--and look here, and Question No. 1 and

20   2 will be--"that JBS has sold and used."  So we have to do

21   this step by step.  We proved that JBS and Jinny directly

22   infringed because they are here in the United States.  If we

23   prove that, then we just have to prove that UNO induced them

24   to do it; not that they were implicit, but that UNO was

25   encouraging.

1           So the first thing we have is you see all these --

2           Pull out of that.

3           You see all these -- this list.  And you have heard these

4    fibers as they have come up.  Pure Exchange, M-Technology Wig

5    Series, Beauti Collection, those are all JBS and Jinny.  And

6    here is what happened.  Same companies owned by JBS -- Same

7    owner is JBS and Jinny.  So here is www.jbshair.com.  And if

8    you remember from Mr. Jhin's testimony, he said they use the

9    same email.  I mean, why not.  They are same company really.

10   I mean, they are the same entity, even though they are two

11   different corporations.  So we have jbshair.com.

12          This hair was tested by our expert.  It infringes.  It

13   meets all the elements.  It is clear as day.  Natura is right

14   on their packaging.  So if UNO is in Korea and saying, "We

15   don't know where this stuff goes," they sure got somebody

16   marketing them here, and it is JBS.  So JBS is selling the

17   infringing product, has Natura -- and you don't have to look

18   at this.  You will have this when you go into the jury room.

19   And here comes the part where I do need the glasses.  But that

20   has an R on it, the registered trademark.  So UNO is even

21   letting JBS use UNO's registered trademark; Natura, by the

22   way, which sounds--I don't care what they say--just like

23   Futura.  It is a nice play on it, but they even copied that.

24   It is manufactured in Korea.  What more do you need to know?

25   What is the big mystery here?

1           Why didn't Mr. Kim just get on the darn stand and make it

2     easy for you and say, "Heck, yeah, we know it is going into

3     the United States."  And why did he play this game of, "I have

4     heard.  I don't know.  It might"?  And how he can get on the

5     stand and tell you I don't know how much is being sold there.

6     Call up your buddy and ask him how much is being sold.  He is

7     the one selling your stuff.

8           Look here.  Flame retardant.  That was like another six

9     hours of Defense testimony that flame retardant is no big

10    deal.  It is not in demand, even everybody kept saying demand,

11    demand, demand.  That is sure what they are advertising.  And

12    they are advertising it because Futura had already been

13    selling it and Futura advertised it as nonflammable.  Are you

14    kidding me?  If you really think about this--and I have to

15    tell you, I am going to use my daughter again, and thank God

16    she is not here to get embarrassed--but she wears this stuff.

17    I didn't know at the time what it was she was wearing because

18    I don't follow her to the beauty shop.  She wears extensions.

19    So if I had known she was wearing flammable crap that somebody

20    was selling, I would have gone ballistic.  Are you telling me

21    there is no demand for something with a flame retardant on it?

22    If you are a parent, I will tell what you are demanding.  I

23    don't care if I am paying extra for that stuff; it is going to

24    be nonflammable.

25          And so Futura was already selling it.  Now here they are.

1    100 percent Natura fiber.  They are putting it everywhere.

2    "100 percent Natura fiber" right above jbshair.com.  And they

3    are advertising right on the cover "flame retardant" right

4    there.  So don't tell me that wasn't in demand and don't tell

5    me that wasn't the reason everyone is trying to do this.

6    Eddie Jhin himself told me he demanded it.  The wig

7    manufacturers demanded it.  UNO wouldn't have done it, but

8    they found an easy way to do it by copying from Kaneka.

9         So all you need to know is on this Question No. 1, the

10   answer is -- Pure Exchange is this one.  Every single one of

11   these -- I mean, there are documents, and I could go through

12   them ad nauseam, and you may have to go through them ad

13   nauseam, if you choose back there, they are all in there,

14   exhibit after exhibit, where it shows that JBS and Jinny are

15   selling Natura products, which later you heard became Unolon.

16   I wonder why.

17        First it starts as Unolon, then it goes to Natura, now it

18   is Unolon again, but it is the same fiber.  They have

19   different formulations of different stuff, but it is all the

20   same chemical that fits in this.

21        And by the way, something else the Judge instructed in

22   claim interpretation.

23        And real quickly go back to page 13 so we don't get

24   confused, because there was some of this, too.  And where it

25   says -- see where it says "In claim 1," go to that third one

 1    there.  Right up above.  Right there.

 2        And it says, "In claim 1 of the '429 Patent and the '430

 3    Patent, the term 'comprising' is a synonym for including and

 4    indicates the listed elements are essential but may not be

 5    exclusive."  You know why this is important?  The patent says

 6    you have to have this stuff.  You can have any other stuff in

 7    there you want.  You can have that antinomy.  Do you remember

 8    that coming up?  We put it in there to make it extra flame

 9    retardant.  You can put in everything that Mr. Lim was saying

10    and Mr. Kim, their super secret formulas and recipes for EZ

11    and XO and H whatever, but as long as it has the

12    tetrabrominated flame retardant, which they all admitted, it

13    still infringes.  I don't care what else you put in there.  So

14    we can get that out of the way, too.

15        So now back to Question No. 1.  If you find for Kaneka,

16    you answer yes to all of those questions, because JBS -- and

17    then Question No. 2 just -- we will get to, and question

18    No. 3, but JBS sells Natura products, which are now called

19    Unolon.  So if you find one, now you it will probably say "100

20    percent Unolon fiber."

21        But JBS directly infringes, and when we get to it, you

22    can't get more inducing than this, that UNO induces.  That is

23    why -- If you were wondering, that is why we have these three

24    people here.  You can't get UNO without somebody here directly

25    infringing, and we found the people that actually have that,

1    quote unquote, special relationship with UNO.  And I will get

2    to that.

3        So what I want to do is make sure, because the verdict is

4    really within all of these questions.  Your answers to these

5    questions are really your verdict.  So Question No. 1 you say

6    yes.

7        If the we can go to question No. 2 real quickly.

8        Question No. 2.  Now what we have decided is for the '430

9    Patent, that is a mixture of human hair and the infringing

10   Natura hair.  So we picked one product, the Beauti Collection

11   2 sold by JBS and Jinny, and we want you to say yes there,

12   too.  That one -- just same thing.  It is this stuff except it

13   has got the human fiber, human hair mixed within it.

14       And in terms of that, interestingly, and you will see in

15   documents that go back there if you want to look, believe it

16   or not, JBS was actually selling some product it picked up

17   from wig manufacturers in China that would mix Natura with

18   Futura and then human hair.  We found some documents where it

19   actually says that.  So JBS knows it was selling hair that was

20   identical because it was getting Natura and Futura even mixed

21   together and then human hair.  So that is Question No. 2.

22       Question No. 3 is the same, except now it is talking

23   about Jinny.  And in case there is any question -- and, again,

24   I want you to answer yes to all of those for JBS and Jinny.

25   If there is any question to you that they are the same company

1    and they are both selling hair, JBS is Eddie Jhin's company to

2    ship it into the United States; Jinny has the beauty supplies.

3    That is all.  That is all.  And if you look, there is an

4    exhibit, if we could just go to that --

5         And Your Honor, when did I start, just to make sure I --

6              THE COURT:  You used about an hour.

7              MR. DAIN:  Okay.  I will try to go about another 15

8    minutes.

9         If you go to Exhibit No. 45 real quick, and blow up the

10   second email, the one right -- Yeah, there you go.

11        You will remember this.  This is Justin Lee from JBS

12   talking to the manager at UNO Fiber and he is saying, "We have

13   shipped the products for the company called" -- and that

14   is -- Oh, it is from UNO Fiber.  That is the manufacturer in

15   China.  And then it says below that, "If we receive an order

16   from Jinny, we will deliver the product as soon as possible,

17   the first priority."  I mean, seriously why did they fight --

18   This trial could have been over in a week.  Why was there this

19   big fight that they weren't selling into the United States?

20   Why did they go through that?  This is UNO telling Jinny, "You

21   send us an order and we will get it to you priority, first

22   thing."  And they get it through wig manufacturers, then JBS.

23        So JBS and Jinny--direct infringement on all this,

24   absolutely.  And so as you go through the questions, and I am

25   sorry if I am rushing, but then there will -- Question 3,

1    Question 4 are all about the 429 and 430 patents.  Just say

2    yes to all of those items.  They all infringe and JBS and

3    Jinny sell them.

4         And again, feel free.  You can even look through their

5    slides if you want.  I think their slides are just -- to me

6    just arguing their point to you, so -- You know, I know they

7    are going to do it verbally.  But really the best thing you

8    can look at is testimony and documents; really the best thing

9    you can look at.  Documents usually tell the whole story.

10   This one doesn't lie.  This was before they knew the gig was

11   up, and it is June 14th, by the way, 2011.  This is after we

12   sued them, after we sued them.  They are still buddy-buddy;

13   "Send us the best stuff you got."

14        And so this is the inducement as well.  So you got all

15   three of them here, right here, so you can find on the

16   questions of inducement.

17        But now I want to get to something I think they are going

18   to argue.  They are going to try to argue they in good faith,

19   in good faith -- If they have evidence of a good faith belief

20   that they didn't infringe or the patent was invalid, then they

21   aren't liable for inducement.  And this is what you have to

22   weigh; not that they paraded three experts up here.  That is

23   not good faith.  Frankly, our expert I really believe he was

24   honest with you.  They asked him a question and he would tell

25   them the answer.  Their experts were there to, you know, give

1  an adverse opinion no matter what; just tell their side.  That

2  is not evidence of good faith.  That is just buying an expert

3  to get up on the stand and tell you, "Oh, it is hocus pocus.

4    Evidence of good faith would be if you saw any email here

5  where somebody said, "Oh, my gosh.  We have analyzed this

6  whole thing and we don't think it infringes," or, "Oh, my

7  gosh, you know, we have talked to a patent agent or an

8  attorney and he doesn't think it infringes;" not getting an

9  expert on the stand to tell you that.  So don't let them come

10  up and tell you, "Oh, we had a good faith belief we didn't

11  infringe" or "We had a good faith belief it was invalid."

12  Their argument is really just to see if they can snowball you

13  that they didn't infringe.  Or really it was even deeper than

14  that--snowball you that they even sold anything into the

15  United States.  So I don't want you to be fooled by that.

16    Let me back up.  That sounded insulting.  I know you

17  won't be fooled by that.  I really believe that you have been

18  sitting here and you have heard all the evidence, and you are

19  the triers of the facts so you will be able to see through

20  that.

21    And then there are others -- You will see in Question

22  No. 7, when you get to it.  If you remember these names--and I

23  am sorry it was so tedious that Mr. Taylor had to go through

24  it with Mr. Kim--but Shake N Go, Sun Tae Yang, Royal Imax, Eva

25  Gabor, Nu JiGu, these are all the importers other than JBS

1    importing.  There is the number one and number two, if you

2    remember Mr. Jhin talking about them.  These are all the

3    importers that are importing the tons and tons of fiber of

4    Natura.  That is also direct infringement.  So there are going

5    to be questions where you circle the same fibers and say yes,

6    they also directly infringe.  We are not suing them.  We are

7    suing UNO.  We want to get to the heart of this.  But they

8    directly infringe, and if they directly infringe, then UNO

9    induced that infringement.  And there was evidence of that.

10        In terms of obviousness, and I have already gone through

11    that.  I mean, this wasn't obvious.  These guys worked three

12    years to find this thing and they found the flame retardant.

13    Don't look back in hindsight and don't let them fool you in

14    looking back hindsight.  It wasn't really obvious.

15        When then it comes to profits that were lost, real

16    quickly, you remember there are only two players in this game.

17    And you saw from UNO's business report they said there were

18    two players.  I can't believe Mr. Burns -- again, talk about

19    being academically dishonest with you.  He got up there and

20    said there are three players or more players.  His own client

21    has a business report that says two players--Kaneka and UNO.

22    That is it.  That is the gig.  There could be some little

23    people out there now and then.  Maybe they are infringing,

24    too.  But, again, look at the documents.  You know, those

25    don't lie.  Those are admissions.  Don't listen to the expert

1  that tells you something different.

2      So what Kaneka did is got estimates.  It went to the wig

3  manufacturers and said, "What are you selling?  What is your

4  production?  We know what we are selling."  And they came up

5  with the estimates.  And what was amazing, and Mr. Burns just

6  wouldn't admit it, was we were accurate.  Our estimates in

7  fact were more accurate than their estimates of what they were

8  going to sell.  If you look at it --

9      If you could turn real quickly to Exhibit No. 115,

10  please, Michelle.  And then if you blow up the part at the

11  top.

12      See, these were estimates.  Remember in -- It is hard to

13  see.  I am sorry.  But in 2008 it was 160 tons -- 160,000 tons

14  we believed were going to come in, see, of Natura and Unolon,

15  and then it was 200,000 in 2009.  If you go over in 2010, we

16  had estimated 480.  And this is the part that drives me crazy.

17  Dr. Nolte, when he was up here, or Mr. Nolte, told you, "I

18  actually underestimated."  So our damage amounts are

19  underestimations of the damage amounts.  We estimated 480 in

20  2010.

21      Now go to the actual numbers that UNO provided.  Mr.

22  Burns didn't know they provided these, but they did.  So even

23  though he was saying he doesn't know how much UNO doesn't know

24  how much is sold --

25      Let's pull out go to 65 page 14.  If you could go to the

1    bottom there, the numbers.

2        Remember I showed this, too?  Here is what they actually

3    showed.  320 in 2008.  It is almost twice as much.  We

4    underestimated by half.  So they even sold more.  300 in 2009,

5    even though our estimate was only at 200.  And then 530,000

6    tons, even though ours was 480.  So if we had used their

7    numbers, we would have gotten a higher number of damages for

8    them.

9        So now, lastly, let me get to Mr. Nolte, because you will

10   have a damage question.  And if you remember Mr. Nolte's --

11       This is No. 843, please, Michelle.

12       He told you they sold 17.9 million --

13           MR. TAYLOR:  No. 842.

14           MR. DAIN:  Fred knows better.  No. 842.

15       Sold $17.9 million worth of this product.  And if you

16   remember from all those documents, it is all coming into the

17   United States.  They tried to tell you it was going to other

18   countries, but their own documents say it is.  So he

19   subtracted from that what our -- what he calls a variable

20   profit rate.  He subtracted what our costs would have been and

21   all our savings and gets $5.5 million.  That is what we are

22   asking you for.  We are not punishing UNO.  It is just the

23   cost of doing business.  If you want to sell our product you

24   have to pay.  And so $5.5 million is what we are asking for

25   damages from UNO.  So there is going to be a question asking

1    you what is the lost profits.  You put $5.5 million for UNO.

2        The other two we are not going to do a lost profit

3    analysis, because we don't compete with JBS.  They are an

4    actual importer, and then Jinny sells it in a beauty shop, so

5    we don't want to hit them with the same kind of profit

6    analysis.

7        Can you go to the next page?

8        Okay.  So this is how he does the calculation.  But what

9    happens is this only goes through August 31st, 2012, so there

10   will be a final question for you, and it is about

11   royalties--what do you do after that date for sales through

12   that date and going forward.  Mr. Nolte told you 15 percent

13   was his royalty.  It is a fair royalty.  Their expert told you

14   five percent.  That is that the what they are fighting over.

15   I am not telling you to split the difference of ten, because I

16   really think our expert presented the proper case.  If you

17   remember, he looked at estimates and Mr. Burns humiliated

18   that.  And when I asked him what he looked at he said, "I

19   talked to Mr. Kim."  Well, if you talk to me about that kind

20   of stuff, I am not going to tell you the correct number.  I am

21   going to give you the lowest number you can get.

22       So there is a question about royalties.  So any damages

23   you don't award the $5.5 million, the next page or a page

24   after that has the question of what the royalty rate is.  Put

25   15 percent.  That is the royalty rate that should apply to

1  UNO, JBS, and Jinny.

2      And then one last thing on JBS and Jinny.  Mr. Burns also

3  slipped up and said that he didn't know anything about damages

4  but he had seen -- if you remember this, "But I did see a

5  document they gave me that JBS and Jinny had sold $580,000

6  worth of this."  And hopefully, if any of you were taking

7  notes, you saw that.  $580,000, and I did the 15 percent

8  royalty calculation, and that is $87,000.  So JBS and Jinny

9  should have to pay $87,000 at a 15 percent royalty rate.  And

10  you will have that.  It will say percentage.

11      So for UNO it is $5.5 million in lost profits and then on

12  the page for royalty, put 15 percent for future royalties.

13      And I am sorry I rushed through that really quickly, but

14  I want to reserve a little time for rebuttal after counsel

15  argues.

16      Again, thank you so much.  I appreciate all your time.

17          THE COURT:  All right.  Thank you.

18      Members of the jury, let's go ahead and take the lunch

19  break.  Be back at 1:45.

20          (Whereupon, the jury left the courtroom.)

21          THE COURT:  All right.  Be back at 1:45.

22          MR. WOO:  So he used about an hour-ten?

23          THE COURT:  That is where I am.  He has roughly 20

24  minutes left.

25          MR. WOO:  All right.  Thank you.

```
 1                    (Lunch recess.)

 2          THE COURT:  All right.  Mr. Woo, ready?

 3          MR. WOO:  Yes, Your Honor.

 4          THE COURT:  Bring the jury in.

 5          (Whereupon, the jury entered the courtroom.)

 6          THE COURT:  Mr. Woo?

 7          MR. WOO:  Thank you, Your Honor.

 8     Ladies and gentlemen of the jury and Judge Solis.

 9          First of all, I want to start out by thanking you for

10     your service.  I know that you have been here everyday in

11     court when we have been in court and have paid close attention

12     to the witnesses and evidence, and I know it has been trying

13     sometimes because it has been tedious at times, especially

14     with the foreign language translations.  I do want to thank

15     you, however, from the bottom of my heart, myself, on behalf

16     of my team, and the people at UNO, JBS, and Jinny Beauty

17     Supply.

18          They call this part of the case closing argument, but I

19     am not going to argue with anybody.  I am not going to argue

20     with Mr. Dain, I am certainly not going to argue with the

21     Judge, and I am certainly not going to argue with you.  What I

22     am going to do instead is show you the evidence and testimony

23     in this case as it has unfolded to you and show you how it

24     fits into our legal theories and why the patents are not

25     infringed and that they are invalid.
```

1          Let me start off by talking about the burden of proof.

2     There are actually two burdens of proof in this case.  One is

3     the preponderance of the evidence standard that Mr. Dain told

4     you about.  It is the scales that tip one way or the other.

5     And what Mr. Dain kind of conflated, though, was that he sort

6     of suggested that our burden of proof is higher somehow on

7     both sides of the case.  That is not the case.  The burden of

8     proof on their case of infringement is a preponderance of the

9     evidence.  They have to at least tilt the scales.  If they

10    fail to tilt the scales, they lose because they have the

11    burden.  Our defense of non-infringement doesn't have to tilt

12    the scales at all.  If it stays even we win.  It is only if he

13    tips the scales one way to his side that he wins on

14    infringement.

15         The burden of proof on invalidity, on the other hand, is

16    a higher standard for my side of the case.  It is that high

17    probability of invalidity that the Judge will read to you --

18    has read to you this morning, and that is tilting the scale a

19    lot.  It is not as far as proof beyond a reasonable doubt, but

20    it is more than it is for the simple tilting of the scales.

21         Now, we have all heard -- I am sure you are all familiar

22    with the adage that it is relatively easy to accuse somebody

23    and it is a lot harder to defend yourself.  If I were to

24    accuse Mr. Marton sitting over there of doing something

25    illegal, and I describe to the police what he was wearing, his

1    yellow tie and his dark suit and so forth, he could be in a

2    lot of trouble.  And for him to then defend himself, it would

3    take quite a bit of argument and quite a bit of proof.

4        And there are -- And if you were that kind of person and

5    you were accused of something, you would not want to hold back

6    any of the defenses that you have.  You would want to assert

7    each and every one of them, because it is something that is

8    really important to you, something that is really at stake.

9        And while Mr. Dain talks about us throwing everything at

10   the wall to see what sticks, it is really -- the problem with

11   this case is that there are a lot of defects in this case, as

12   I will show you with the evidence.  The reason why you

13   have -- Excuse me.  There are a lot of things wrong with the

14   case and, as a result of that, it is not so much that we are

15   throwing something against the wall to see if it sticks.  It

16   points to the weakness in Plaintiff's case, and I think you

17   are going to find that the case is so weak that it is going to

18   fall apart.

19       Now, the Judge's charge this morning included the

20   statement that arguments made by lawyers are not evidence in

21   the case.  And arguments, that is all we heard for the first

22   half hour, maybe an hour, of Mr. Dain's closing.  He didn't

23   show you any evidence.  Half an hour went by and he showed you

24   finally the patent, and then he showed you the jury charge,

25   and then about an hour into his presentation he finally showed

1    you PTX 45, which was an email that simply suggested that UNO

2    expedited a shipment to one of the Chinese wig makers so the

3    people in the United States at JBS or Jinny could get a

4    shipment faster.  But he never showed you anything about the

5    real science in the case.

6        He didn't show you any of the evidence that shows whether

7    or not my clients actually infringed the patents, and he

8    didn't show you any of the prior art, and he didn't show you

9    any of the testing results that Mr. Jacobs talked about.  And

10   actually when -- you can probably remember this because it was

11   only this week, Mr. Jacobs never even showed you any of the

12   evidence himself.  He just talked about it as if it really

13   existed.

14       So let me go into the evidence.  As you know by now, the

15   patents in this case are about hair fiber; hair fiber that

16   already existed; PET hair fiber that was high heat resistant

17   and had the gloss and the color and all the characteristics of

18   human hair that people wanted.  And this hair fiber, this PET

19   fiber was already on the market in 2001, long before Kaneka

20   applied for their patents in 2003.  And actually it was even

21   before -- it wasn't until another year later that Kaneka

22   actually released the product, their product, their first PET

23   product onto the market.

24       And the thing about this was that, well, the PET hair

25   that was already on the market had all these desirable

1    qualities of gloss, luster, sheen, and curlability and high

2    heat resistance.  It wasn't until December 2003, when UNO's

3    customer Boyang asked for a flame retardant version of this

4    fiber, that they started that development.  There is no

5    evidence that there was any demand for a flame retardant PET

6    fiber before that.

7        And the reason for that is relatively simple.  This is a

8    fashion hair accessory.  It is something that people would

9    want to buy on their limited budgets, and price was a real

10   factor.  Flame retardants would be expensive, and the fiber

11   was already high heat resistant.  We have heard testimony from

12   everyone in the case, even from Kaneka's witnesses who tested

13   my client's fibers and found that it would resist melting all

14   the way up to 465 degrees Fahrenheit.  Now, the temperature in

15   your oven is 500 degrees, so it would take quite a bit of heat

16   just to melt the fiber.

17       So there wasn't a high demand at all for flame

18   retardance.  Yeah, people were concerned about it, but

19   remember the primary -- for better or worse, the primary

20   market for my clients were overseas in Asia, the Chinese wig

21   manufacturers, and they are the ones to whom my clients would

22   sell, and they never really asked for a flame retardant

23   version.  Why?  Because they are over there in China and they

24   are not worried about lawsuits in the U.S. for liability.  Now

25   it is true that importers in the United States would be

1     concerned about that, and eventually the market caught up.

2          Can we have the slides up, please?

3          And this first slide shows what I just talked about.  By

4     2004 when Kaneka first came out on the market with its first

5     PET fiber, Unolon I was already out, and Unolon GD, the high

6     heat resistant version, was already out and has been there for

7     quite a while.  And UNO began the development of its Natura

8     fiber in December of 2003 when Boyang asked Mr. Kim, "Would

9     you please make a version of this fiber?  This Unolon GD, make

10    it flame retardant."  And so they started that effort in

11    December 2003, and eventually got to the point where they were

12    able to launch it in November of 2004.

13         Next slide.  Let's blow this up a little bit.

14         This is DTX 1387.  But even after the products were on

15    the market, customers still had to be convinced that this is

16    something that they really wanted to buy.  This internal

17    Kaneka document showed that "consumers seem to have a shallow

18    understanding of the importance of flame retardancy.  The

19    flame retardancy has not been sufficiently communicated."

20    What does this mean?  This means even after this flame

21    retardant PET was on the market, the people who made the flame

22    retardant fibers had to convince customers to buy it.  It

23    wasn't like the market was clamoring for it and saying, "We

24    really need this and why can't anybody make it."  It is just

25    because people -- Rather, it was because people really didn't

1    care about it.  What they cared about was the fashion

2    attributes of it and the price.  So it took a while for this

3    to catch on and they had to actually educate the market about

4    it.

5         And then after there was a request for a flame retardant

6    version of the PET fiber, it wasn't long before they actually

7    developed one.  What did both companies do?  They

8    asked -- they studied up the literature, they asked flame

9    retardant manufacturers, "Gee, I have a PET fiber.  What do I

10   use to make it flame retardant?"  And everybody told them they

11   need to use a brominated epoxy flame retardant.  P&C told UNO

12   that and Sakamoto told that to Kaneka.  And both companies,

13   within that very short period of time after being told about

14   brominated epoxy, almost everybody developed their versions of

15   the fiber.  It didn't take that long at all.

16        Now, UNO, as we have also heard in this case, doesn't use

17   the same method of producing its flame retardant fiber that

18   Kaneka uses.  It uses, as Mr. Lim explained, this double

19   compounding process of the flame retardants before it ever

20   gets mixed with the PET.  Instead of using off-the-shelf flame

21   retardants and mixing it directly with the PET fibers, they

22   double compounded first.  And the reason for that is to

23   enhance the mixability of the material so that when it comes

24   through the fiber splitting machine it doesn't break quite as

25   easily, the yields are higher, and the fiber is better as a

1    result.

2         And all of that has a chemical result in this matter.

3    The chemical result is that, as a result of the compounding

4    process, the polymer is highly branched.  It is no longer

5    linear.  It may start out that way, but when it goes through

6    this double compounding and triple compounding process, it

7    comes out highly branched.  And because of that, my clients do

8    not infringe the patent which requires a linear

9    tetrabrominated epoxy flame retardant.

10        Now, importantly, that compounding process wasn't done

11   just to try and skirt around the patents.  Kaneka

12   developed -- UNO developed this process in 2004 when they

13   launched the first product.  You heard testimony about that

14   and it has been uncontroverted.  It wasn't until six years

15   later that the patents actually came out.  So there is no way

16   that UNO could have done this just to try to avoid the patent

17   that they didn't know about and couldn't know about for

18   another six years.

19        Now, let's get to the evidence, as I promised.  So we are

20   all familiar with the Toray references.  We are familiar with

21   the Toray book, the fiber, and the 668 Toray patent.

22        Now let's look at the next slide.  Actually let's go back

23   one.

24        So the point of this slide is all of the material in blue

25   about Toray was already known in the art.  It was known not

1    only to persons of ordinary skill; it was known to everybody

2    in the industry.  It was known to Kaneka in particular,

3    because they knew about it and studied it.

4        Next slide.

5        Now, as you will remember, the Toray '668 Patent

6    disclosed in 1997 the same composition that is in Kaneka's

7    patents that they sought in 2003.  We see the publication date

8    of 1997 here and we see that this invention is for a flame

9    retardant polymer composition.

10       Next slide.

11       Now, as I showed you in opening and I am going to show

12   you again here, the Toray '668 Patent disclosed exactly the

13   same composition of the flame retardant that was later claimed

14   in Kaneka's patents.  It had the same 100 parts by weight

15   polyethylene terephthalate, it had 18 parts brominated epoxy

16   flame retardant, and that is, of course -- 18 fits between 5

17   and 30, it has the exact same linear structure that is given,

18   and it meets every limitation of the patents.  So this is

19   plainly prior art and it is plainly art that Kaneka used for

20   its own purposes later when they claimed their invention.

21       Next slide, please.

22       And Toray was not just about this flame retardant

23   composition used for molded materials.  Mr. Dain keeps talking

24   about how this material is only really used for plastic, hard

25   plastic things like computer cases and TVs and things like

1    that.  But the reality is Toray also had a flame retardant

2    fiber with bromine flame retardant in it, and Kaneka knew that

3    because they analyzed it.

4        Next slide.

5        And they also knew from that analysis that the Toray

6    fiber, it was clearly a brominated fiber.

7        Next slide.

8        And then we have the Toray '668 Patent having the exact

9    same chemical structure as the formula claimed in the '429

10   Patent.

11       Now, again, Kaneka's excuse for this is, "Well, this is

12   only for plastics and molded articles.  Nobody would ever

13   think of using it for hair."  But that isn't the way that we

14   should be thinking about that.

15       That is not the way that the analysis is for obviousness

16   and invalidity in this case.  What the instructions are are

17   that you are supposed to look at the prior art from the lens

18   of a person of ordinary skill in the art; what did that person

19   know before 2003.  They would have known about Toray '668.

20   They would have known about Toray fiber being flame retardant.

21   They would have known that the Toray fiber was flame retardant

22   with bromine.  And so somebody looking at that problem and

23   then somebody walking into their office and saying, "Look, you

24   are a person of skill in the art; you know all about Toray,

25   you know all about fibers already; how do you make this flame

1    retardant?"  And they would say, "Well, we use Toray '668,

2    because that is a flame retardant that is recommended for use

3    with PET."

4         And it doesn't matter, as you have heard, it doesn't

5    matter whether you start -- whether you end up with a molded

6    article or a fiber at the end.  If you want to make something

7    flame retardant, you take the flame retardant chips and you

8    mix it with PET, and then what happens after that is what

9    determines what goods you have after that.  You can either

10   mold it into a plastic or you could spin it into a fiber.

11   Either way, you are starting with the same starting materials,

12   and people in the industry knew how to do that.

13        And if you think about it, it only makes sense.

14   Obviousness is kind of a funny legal concept and it has got

15   this funny very complicated explanation.  But what it really

16   means is that we are taking the sum and substance of people's

17   knowledge in the area and then we are going to try and see how

18   different the patent is over that knowledge and to see whether

19   anything was really added to it.  And if what was added to it

20   was just a piece that is obvious to everybody else in the art,

21   then it is not an invention.

22        If you think of a person making a jigsaw puzzle, and the

23   jigsaw puzzle is filled in already with only one piece

24   missing, it may be tough when it is all apart, but to a person

25   of ordinary skill in the art, they have all the prior art and

1  they know that in their head. That is the legal test. And it

2  is like having a jigsaw puzzle that is almost everything built

3  for you but that one piece is missing, and somebody says,

4  "Come along and fill in that piece because now we have a

5  customer who wants a flame retardant PET fiber." And so that

6  is what they did. That is all they did. They put that

7  missing piece together.

8      If someone were to ask you, "How do I paint my kitchen",

9  well, I know that I use a certain kind of paint for that;

10 probably a waterproof paint because I don't want things -- you

11 don't want them to get destroyed by water. And then if I

12 were -- somebody were to ask me, "Well, Darryl, now that you

13 have painted my kitchen, can you paint the bench outside my

14 backyard", well, I wouldn't have to have someone tell me, "Oh,

15 well, now I have to learn about, you know, the bench art,

16 figure out what benches are all about." No, I know that

17 applying this paint, this waterproof paint in my kitchen works

18 there and now it is going to work -- it is likely to work on

19 my bench as well.

20     And that is what all this is about. This was an addition

21 of brominated epoxy flame retardant that was known already to

22 be good for use with PET to be used now with the fiber that is

23 going to be spun into hair. But that wasn't rocket science

24 and it wasn't an invention, and we will show you more about

25 that later.

1       Now, again, this art, you know, Kaneka says, "Well, it

2   really wasn't applicable.  Nobody would have thought about it.

3   Nobody would have used it."  But that is not what the evidence

4   showed.  They said that no one would think about it, but they

5   ignored -- but that ignores the fact that Toray had a fiber

6   that had bromine flame retardant in it.

7       Next slide.

8       And we heard from Mr. Masuda on the first day of trial.

9   Right?  He said that Toray '668 was totally different.  What

10  technology is the Toray patent directed to?  He said, "It is

11  totally different, and there is nothing I could use as a

12  reference."  Well, was that really true?

13      Let's look at the next slide.

14      Here is the document I showed you earlier in the case

15  during Mr. Masuda's examination and also in part of opening

16  statement, DTX 1319.  If it was so irrelevant, why were they

17  looking at it?  Kaneka was looking at this and said, "Gee, it

18  is a problematic patent."  They went through 9,000 cases,

19  narrowed it down to 575, and then narrowed it down to this

20  one.  And if it was so off-the-charts irrelevant, why would

21  they say that it was -- why would they say it is problematic?

22  Well, the reason why is because they knew as chemists that the

23  chemistry is the same.  We are looking for polyester fibers.

24  It is the very same technology--PET and brominated epoxy, a

25  combination that is so old in the art that there is lots of

1    references about that.  We never had to show you them because

2    we wanted to narrow it down to 26.  That big stack here on

3    Mr. Dain's desk shows you how old PET was and shows you how

4    old brominated epoxy was.  There are all kinds of uses for

5    that substance.

6        Next slide.

7        And then Mr. Masuda, after we confronted him with this

8    sort of anomaly like, "Well, if you said you learned nothing

9    from Toray, why did you think it was problematic?"  He says,

10   "well, you know, they are actually closely related, and the

11   extraction means that after screening we have picked up those

12   that seem to be particularly relevant or related to our

13   technology."  Particularly relevant.  That is what he said.

14   And if he didn't think that -- That is a huge contrast to

15   saying, "We learned nothing from it."

16       Next slide.

17       And on top of that, we have Kaneka's internal documents

18   with the inventors' names on it--Masuda, Shiga, Kowaki, and

19   Shinbayashi.  And this is in DTX 1026.  They said this is a

20   problematic patent that has the same structure.

21       Next slide.

22       And then not only that, Kaneka went and looked further

23   and they concluded that Toray '668 was the same as their

24   invented fiber.

25       Now, I have had these documents made in slides.  You are

1    not going to -- well, maybe you have some of them, but not

2    this one, but I have made them made into slides because they

3    are in a foreign language, and the reason, you know, it is

4    just really hard to do the same thing and show you this in a

5    foreign language document.  So that is why I made up the slide

6    so I can show you the official translation and the high points

7    of this document.

8         And, by the way, you know, Mr. Dain talks about how the

9    patent examiner couldn't have found this or didn't find this,

10   or what is the problem with the examiner.  Last I looked, I

11   don't think people search the internet if the U.S. Patent

12   Office for Japanese language documents.

13        At any rate, Kaneka concluded Toray '668 was the

14   same--the same polyester, the same brominated epoxy flame

15   retardant agent with the same chemical structure, and the same

16   degree of polymerization.  It is even down to the length of

17   those beads, the M equals 30 to 150 in the patent, in the '429

18   Patent.  Same degree of polymerization.  They found that and

19   they saw that, Kaneka did, in the '668 Toray patent.

20        Next slide.

21        And so -- And then they looked at the Toray book, and the

22   Toray book showed this other Dainippon Ink flame retardant,

23   another brominated epoxy flame retardant.  And again, remember

24   we showed you this and we showed this during Mr. Masuda's

25   examination, these three structures are copied in the exact

1    same order as -- from the book as compared to the patent.  If

2    this book was not relevant, didn't teach them anything about

3    brominated epoxy flame retardants, why would you copy it?  I

4    mean it just defies credibility to say that these three

5    -- There is like maybe 27 different ways to list these in

6    order, and instead they took the one out of 27 that is exactly

7    the same as in the book.

8         And if they didn't -- So if they didn't think that the

9    Toray patents or the Toray book or the flame retardant

10   teachings were applicable to their patents, surely they

11   wouldn't have copied them right into the patents in the same

12   structure and the same order.

13        And then we know that, of course, Mr. Masuda did not

14   disclose any of the Toray teachings to the patent office.  You

15   know, we asked him, "That rank A the top number one

16   problematic patent that you identified was Toray '668.  Right?

17        "Yes."

18        "And despite concluding that it was closely related

19   technology, you did not disclose Toray '668 to the U.S. Patent

20   Office, did you?"

21        "No, I did not."

22        "And by not telling the patent office about the '668, you

23   did not give the patent office a chance to decide if it agreed

24   with you that it wasn't relevant."

25        "Maybe they did not have a chance."

1    Well, they didn't have a chance.  As a result of Kaneka's

2    intentional decision not to disclose the teachings of the

3    Toray materials, the patent office never got to consider Toray

4    fiber Toray book, Toray '668 Patent, all that teaching.  Again

5    they claim it wasn't related to their claimed invention, but

6    given the duty of candor that they owed to the patent office,

7    you would think why take the chance?

8    As Mr. Dain keeps saying, patent examiners aren't idiots.

9    They are people of skill in the art, and if they saw -- if

10   they were skilled in the art, surely they would see things the

11   way Kaneka did, if that were truly the case.  And why would

12   you take the chance of losing your patent and violating your

13   oath to the patent office under oath, you know, I think the

14   inventors signed, if you -- by not disclosing it.  Instead,

15   you disclose it and you would say, "The patent office is going

16   to agree with me.  Because why?  Because I am right.  I am

17   thinking that this is not anything close to what I am doing."

18   If they really thought that, they would have just

19   submitted it to the patent office.  Instead they withheld it.

20   They withheld it because they knew that the patent examiner,

21   instead of agreeing with them, would disagree.  So the patent

22   office never got a chance to evaluate it.

23   And that argument here in the court flies in the face of

24   the fact that Kaneka determined that the Toray patents were

25   problematic and that it contained the exact composition they

1    claim in their patents and they copied into their patent

2    application.  So here we are having to defend this case on

3    patents that issued because the patent office never got a

4    chance to know about Toray.

5         So now let's look at the claims.  I have on the board

6    here claim 1 of the '429 Patent.  It claims two parts.  Part A

7    is the polyester.  You know that is not really in dispute.

8    And B, the linear tetrabrominated epoxy flame retardant

9    including impurities with polymer chemistry.  That is what

10   this is about.  It is about a chemical composition of the

11   fiber itself; not about whether or not it is flame retardant.

12   It is not about the flame retardancy at all.  It is about it

13   is flame retardant that has these two parts and this chemical

14   structure, and the only way to figure out that chemical

15   structure is to do the kind of testing that my experts

16   did--GPC, NMR, MALDI.  They did all those tests on the fiber

17   to determine whether or not the composition requirements of

18   this claim were met.  So the key is whether or not

19   these -- the fibers have that formula.  It is not about

20   whether it is flame retardant.  It is not about that at all.

21        And the way the patent works is you only count the flame

22   retardants towards this 5 to 30 parts by weight if they have

23   this structure.  A non-linear branched brominated epoxy flame

24   retardant doesn't fall within this scope and that isn't

25   counted toward the 5 to 30 parts.

1          That is why you have heard so much evidence from our

2     witnesses about the science behind the composition.  Why is it

3     that we did that?  That is why; because that is what the

4     patent requires in order for there to be any infringement.

5          And by the way, it is Kaneka's burden to show that UNO's

6     flame retardant polymers fit within that linear definition or

7     impurities that are also included.  If it is a tie, they lose;

8     their burden to show that.

9          Now, Mr. Jacobs, you remember Mr. Jacobs, he never tested

10    for -- he never tested the level of branching.  He never

11    tested that.  He alluded to testing done by Intertek, the lab

12    he hired and so forth, but we never saw the actual evidence of

13    that.  He just talked about it.  He said, "Well, you know, I

14    hired this lab Intertek, and they did a great job, and they

15    showed that there was no branching."  Well, if they had test

16    results that scientifically show that there was no branching,

17    that it was all linear, I am sure that we would be sitting

18    here and that would be shown to us six times over.  It would

19    be blown up on a board, the wall, and we would have it all

20    over the documents.  But we never saw a single NMR trace from

21    Intertek, except the one I showed Dr. Jacobs, and he said

22    that, "Oh, yeah.  Well, that is the one that it wasn't good

23    enough."  We will show that to you in a minute.  Maybe we will

24    show it to you now.  I am getting ahead of my outline.  As you

25    can see I am a little excited about this myself.

1      But he never tested it.  He just said, "It is a small

2   insignificant amount, and I don't expect there to be any

3   branching, so I am not going to look for any."

4      Next slide.

5      Instead actually -- Let me get to this.  So instead of

6   any kind of real traces or NMR studies or anything like that,

7   he has this single spreadsheet.  And then I asked him on cross

8   examination, "These two lines here where it says 80 percent,

9   80 percent and then 19 percent and so forth, were those -- you

10  know, were those the starting recipes or the actual finished

11  materials?"  He said, "No, no, no.  They are the starting

12  materials."

13     "Well, we all know it changes a lot and your lab Intertek

14  tested the actual composition and the finished fiber.  Why

15  don't we have those instead?"

16     "Oh, no, we don't have to do that because the numbers

17  aren't that different."

18     The fact of the matter is, we never saw those Intertek

19  numbers, and the reason for that is -- Well, we don't know the

20  reason for that.  I suspect that, again, if it showed the

21  right numbers and the right kinds of branching and linear and

22  so forth, we would be seeing them all over the place, but we

23  never saw them.

24     And then I asked him --

25     Next slide.  I guess not.  Go back.

1    So the two rows that we have been talking about, those

2   numbers were derived from the starting materials; not the

3   finished testing.  So it is not the testing of the actual

4   fiber.  He is just looking at the starting materials and

5   assumes there is not going to be any change.

6    Next slide.

7    And then the other thing I asked him was, "These

8   proportions, do they distinguish between linear and branched?"

9   And he said, "Well, no, it just shows the total flame

10   retardant based on the information."

11    So there is nothing in his chart that really resolves the

12   question of infringement.  There is nothing in his chart.  He

13   just says 80 percent PET, around roughly 20 percent brominated

14   epoxy, but he doesn't distinguish between linear and

15   non-linear.  That wasn't in that spreadsheet.

16    Next slide.

17    Now, you remember Dr. Grayson.  He explained to you how

18   nuclear magnetic resonance works.  It is like shaking this

19   bell tree, and you get the resonance of the bells and you can

20   test for the frequency in pitch and you can determine what the

21   notes are and what the bell would look like.  The same sort of

22   thing with the molecule.  You could shake it a bit, make it

23   resonate, and then you can see where the hydrogens are and

24   where the carbons are and so forth, and that is how you can

25   tell what material you have.

1          And again --

2          Next slide.

3          This is a slide that I showed Dr. Jacobs.  The Plaintiff

4     never showed this to you.  I had to show it to Dr. Jacobs.

5     This is the only trace that we see from their side of the

6     case, and this was -- this shows that the number of scans was

7     32, and then -- which was not enough.  Remember Dr. Grayson

8     said in order to get an accurate reed you need to scan this

9     thing between 500 and a thousand times.  This is 32 times.  So

10    the fact of the matter is, just because this result doesn't

11    show any branching doesn't mean it doesn't exist.  It means

12    they didn't do a very good test.

13         And Dr. Jacobs even admitted that --

14         Next slide.

15         -- that this NMR analysis done by Intertek was flawed.

16    It didn't provide a valid statistical sample.  We saw that it

17    was only 32 scans when Dr. Grayson said it should be 500 to a

18    thousand.  Dr. Jacobs said it is flawed.  Did we ever see the

19    Intertek proof in this case?  No.  And again, it is Kaneka's

20    burden of proof.  They have to prove to you more likely than

21    not that it was all linear.  They haven't even tried to prove

22    that through any of the testing compositions.

23         Next slide.

24         So what do we have instead?  We know Dr. Spiegelberg, the

25    guy who talked too fast because he was excited about

1    science--actually he and Grayson were kind of like the

2    same--but Dr. Spiegelberg went and did triple detection GPC,

3    and as a result of his testing, the scientific testing that he

4    actually did, and he is a specialist in polymer

5    characterization, which is the science of studying how -- what

6    is really in the molecule, he did this test and he found there

7    is so little linear material that were not even in the zone of

8    the Kaneka patents.  You have to have between 5 and 30 parts

9    compared to the PET, and all of the levels of flame retardance

10   in the UNO fibers were well below that, as you can see by the

11   slide.

12        Next slide.

13        And what I mean by that, by almost all of it was

14   branched, this is what I mean.  The amount of branch flame

15   retardant was extensive in the UNO fibers.  Again, branched

16   means it is non-linear; it doesn't fall within the scope of

17   the claims.

18        Now, Kaneka says, "Well, you threw out too many of these.

19   You threw out the little ones.  These were really just

20   little -- All these beads, you know, I don't want to throw out

21   all these pearl necklaces where they only have one

22   imperfection."  That isn't what we are talking about.  The

23   ones with only the little imperfections that Dr. Jacobs says

24   he saw were not even included in Dr. Spiegelberg's testing.

25   Those would have been counted as linear along with all the

1    others.  The testing was designed to find the big ones, the

2    highly branched molecules, and those are the ones that he

3    threw out.

4         Next slide.

5         This is what it really -- According to Dr. Spiegelberg,

6    this is what it looks like.  It is not just one little

7    imperfection.  It is all these branches.  Every single one of

8    these branches here, all these branches make the molecule

9    non-linear.  Linear is just a straight string with no side

10   chains.  You can see from Dr. Spiegelberg's testing that what

11   he found were that nearly all of these were like these big

12   long things with lots of side chain branches.  They were not

13   linear.

14        Now, Dr. Jacobs mentioned on the last day of testimony

15   that Kaneka ran tests on UNO's fibers.  They are hardly a

16   disinterested party.  And you have to wonder to yourself, if

17   Intertek was such a great one and the one they used and

18   reliable and so forth, why do we have Kaneka do the testing?

19   Why do we have an interested party who wants to show linearity

20   do the testing?

21        And even they did the best they could to get a linear

22   molecule out of it.  Remember they sonicated it which is like,

23   you know, doing the kind of Waterpik thing your dentist does

24   in the office.  It breaks apart the molecules; breaks apart

25   the branching.  And Dr. Jacobs couldn't figure out how many

1    scans they did even.  He said that data is not on the list.

2    And so even they who had -- they, Kaneka, who had every

3    interest in showing linearities as opposed to branching, what

4    do they conclude?  We read the report.  The flame retardant

5    agent extracted from the fibers by UNO are branched.

6         And then I read this NMR analysis.  This is the Kaneka

7    analysis now.  Every incentive to find linearity instead of

8    branching, all of the sample flame retardant agents have

9    branched chemical configurations.  This is found by Kaneka's

10   own testing.

11        And again, if this showed these little branches and

12   everything was linear, we would have seen that blown up huge

13   in this case.  We never saw the Kaneka tests.  None of that

14   was ever shown to you as evidence in this case.  And it is

15   their burden.

16        Next slide.

17        Now, by contrast, Dr. Spiegelberg--you may recall these

18   slides--he explained the way -- his methodology, he explained

19   the testing and how he did it himself and how he found that

20   the precompound blend had a different viscosity and different

21   molecular weight and, by this chart, showed that the Unolon

22   material after processing, after it is processed into a fiber,

23   becomes highly branched.  That is the difference in this line.

24        Next slide.

25        And then he showed you how what a linear molecule would

1    look like on the graph, and then he showed you how the pink

2    line would be showing that it is branched because it drops

3    down below the line for linearity.

4         Next slide.

5         And again, the same thing.  He showed the differences

6    between linear and branched, the G prime chart, and he showed

7    that it was all branched, or almost all branched.

8         Next slide.

9         So then we get to the question of impurities.  Now, I got

10   to say, Mr. Dain tried to imply that my experts weren't really

11   experts and they only knew about science and he knew about

12   flame retardants, and I think you can see past all that.  The

13   fact of the matter is, our experts explained the science to

14   you.  They explained their methodology to you.  They showed

15   you their results.  And they were recognized by the Court,

16   each one of them, as an expert in polymer science and polymer

17   characterization.  Kaneka never offered up Dr. Jacobs as an

18   expert.  He didn't explain the science.  His last hands-on

19   experience with NMR was back in the '60s when he was a

20   graduate student when computers ran on punch cards.  As you

21   heard him explain, he doesn't push the buttons on the NMR

22   machine.

23        So where is the evidence?  There is none.  There is no

24   evidence by Intertek, there is no evidence by Kaneka, there is

25   really no evidence by Dr. Jacobs, other than his statements,

1   really.

2       And then on impurities.  Now, we asked him about what is

3   an impurity, and he says, "If the flame retardant were

4   branched and not an impurity, then it wouldn't fall within the

5   scope.  You agree with that?"  And he says, "Well, in the

6   sense it was a large quantity.  I mean, impurity to me is

7   something of a few percent; one, two, three, maybe up to 10

8   percent.  Ten percent or more, yeah, I would say it is not an

9   impurity."

10      "And if it were intentionally induced, it would also not

11  be an impurity, would it?"  And he agreed with that as well.

12      And under that definition by Dr. Jacobs himself, the

13  branch polymers in UNO's fibers--we saw that chart, that huge

14  graph chart--that is way over you know 80, 90 percent.  It is

15  certainly way more than ten percent.  And so it is not an

16  impurity even as to the quantity.  And then as to the intent,

17  that was what we showed by way of Mr. Lim's compounding step.

18  Right?  They purposely compound the material so that it

19  increases the branching and so forth.  Here it is on this

20  slide.

21      You see on the left it starts out with a flame retardant.

22  They get mixed together, they start out linear, they get mixed

23  together.  Not just mixed together.  Mr. Dain keeps saying,

24  "It is just mixing.  You know, What is going to happen then?"

25  No, it is not just mixing.  It is high heat, high pressure,

```
 1    the weight of an entire building on your body laying down on

 2    the sidewalk.  Under those kinds of conditions, there are all

 3    kinds of chemical reactions that happen inside this material

 4    and they start to become branched.  And that is what we have

 5    in this S10 chip.

 6         And then after that it gets compounded again; not just

 7    once, but twice, so that the S10 chip comes out, then, as the

 8    N-Series chips.  These are the flame retardants, the highly

 9    branched flame retardants that UNO uses mixed with PET to make

10    the fibers, and that is what happens in this slide here.

11         So even under Dr. Jacobs' definition, these highly

12    branched flame retardant polymers are not impurities.  They

13    are way more than ten percent.  Almost everything is branched.

14    They are -- And this branching is purposely done to improve

15    the fiber results.

16         And again, this is done back in 2004.  It wasn't just an

17    attempt to design around the patent.  The patent did not come

18    out until 2010.  This process was developed in 2004.

19         And it was -- And it had a definite effect.  And not only

20    that.  You can see by the steps it is not easy to do.  I mean,

21    you know, high temperature, high pressure, it adds processing

22    time to the processing of the fiber, it adds cost and expense

23    because you have got to pay for the pressure and you have got

24    to pay for the energy to heat up the material, and why would

25    you do that unless there was an actual effect on the fiber?
```

1    You wouldn't do that.  If you want to try to save expense and

2    people are always trying to do that all the time in

3    manufacturing, you don't want to add steps that you don't need

4    to do, but they found that this improved the quality of the

5    fiber so they did it, and they did it on purpose to get the

6    result.  And, as Dr. Spiegelberg explained, the result is a

7    highly branched flame retardant polymer.

8         Next slide.

9         And then we see after this it gets -- the branching

10   increases after it gets spun through the melt spinner.

11        So under Dr. Jacobs', you know, his own definition of

12   what is an impurity, if you think about it, it is something

13   small and is not intentionally done and doesn't affect the

14   character of the material.

15        If you think of a glass of water with a spec of dirt in

16   it, the dirt would be an impurity.  Right?  And if I ask you

17   to drink it, probably with a little bit of dirt you probably

18   wouldn't care, bottom's up, no problem.  But if it were

19   something like this where the dirt, you intentionally add the

20   dirt to it until you get to 93 percent, 99 percent, 84

21   percent, it is not longer an impurity, is it?  And it is no

22   longer a glass of water.  You wouldn't want to drink it.  It

23   is now a glass of mud.

24        So for them to say that because, you know, even though

25   all of our flame retardants are branched, by Kaneka's own

```
 1    testing that they are still somehow linear and somehow an

 2    impurity that is included, that just doesn't make any sense at

 3    all.

 4         Next slide.

 5         So as we can see here, the fibers do not infringe the

 6    Kaneka patents.

 7         Click on that, please.

 8         You see again the 5 to 30 parts of linear brominated

 9    epoxy is what is claimed by the patents, and my client's

10    flame retardants don't meet that at all.

11         And then again, Dr. Jacobs never quantified the

12    linearity.  Again, there is no testing by him for branching.

13    He just assumed it would be there.  He said Intertek didn't

14    find any branching, but he admitted they didn't do a very good

15    job.  And there is just no evidence of that and it is their

16    burden.

17         Now, Kaneka made a big deal of the hair qualities during

18    this case.  Right?  They said, "Oh, well, people looking at

19    Toray and the other prior art, they wouldn't know -- they

20    wouldn't be looking for"--wouldn't be looking for I think is

21    the word they used--"wouldn't be looking for a material that

22    wasn't related to hair."  Again, that is not the way you look

23    at it.  And the limitations of the patent say nothing about

24    those hair qualities.

25         Again, we asked Mr. Masuda about those hair
```

 1    qualities--are they in the patent, does it say anything about

 2    curl or glass or transparency.  It doesn't even say anything

 3    about having to be human hair.

 4        And Mr. Dain derided Mr. Ellison about this.  "Can you

 5    wear a mop on your head?  Would a mop fit?"

 6        "Well, yeah."

 7        "Because why?"

 8        "The reason for that is if the mop was made out of a

 9    polyester and it had a linear tetrabrominated epoxy flame

10    retardant, and if it was between 30 and 150, even if it looked

11    terrible as hair it, would fit that claim."

12        Now, if there was another limitation on this patent.  If

13    it said, for example, wherein the fiber looked like human hair

14    and had curl and gloss and translucency like human hair, then

15    the mop would no longer fit.  Right?  Because the mop would

16    not fit with that added claim limitation.  But that limitation

17    doesn't appear anywhere in this claim.

18        And what they are really trying to do with adding those

19    hair kind of like qualities to the claim, that they don't

20    exist by the way, because you don't see them there, they are

21    trying to avoid invalidity, because they are trying to say

22    that all the prior art that we say that taught the addition of

23    brominated epoxy flame retardant to PET isn't relevant,

24    because it doesn't say anything about hair.

25        But again, that is not the test.  The test is you look at

1   what was added to the prior art by the patent, and if the

2   differences -- if that difference is so small and that last

3   piece of the puzzle and it is obvious, then the patent is not

4   valid.  And again, they, Kaneka, never gave the patent office

5   a chance to look and test the Toray prior art against their

6   patent.

7          They like to talk about --

8          Sorry.  Did I skip a slide?  Next slide.  Yeah.  Oh, I

9   see.  Go back.

10         So again, how relevant is the Toray '668?  We don't need

11   to know much more than Kaneka thought it was relevant.

12         Next slide.

13         Because we have seen by Dr. Spiegelberg's testing and his

14   examples, Defendants do not infringe.  Why?  Because this

15   requirement of linear brominated epoxy flame retardant is not

16   present in any of the Defendants' products.

17   Q.   Now, Kaneka likes to talk about UNO's copying, but that

18   is really a smoke screen because infringement, as you see and

19   have been instructed by the Court, isn't about copying.

20   Infringement is about whether or not the finished fibers, the

21   composition chemically, fit the elements that are present on

22   the screen.  On that board.  Excuse me.

23         And, in fact, UNO independently developed their fiber.

24   They basically took their already existing high heat resistant

25   Unolon GD and they added a flame retardant to it.  They did

1    that with this timeline -- according to this timeline here,

2    they began the development after Boyang asked for it.  They

3    visited with P&C and were told to use brominated epoxy.  They

4    got a sample.  They bought a sample, and then they tested it,

5    and then they asked for -- you know, Mr. Lim asked for

6    reimbursement.

7        Now, despite all that blustering, I want to make sure I

8    get this right, because you will recall Mr. Dain yelling,

9    practically yelling at Mr. Lim about this.  He thundered about

10   how "These dates don't line up.  How did you get the

11   brominated epoxy, and tested, and you know, why these receipts

12   are the wrong dates?"  But Mr. Lim kept trying to explain and,

13   of course, Mr. Dain, who I am pretty confident doesn't speak

14   Korean, kept cutting him off before he even heard the answer.

15   But he eventually got to explain under my redirect, and he

16   said -- I am getting ahead of myself again.  But he said that

17   what happened was -- It was a different sequence.  What he

18   said happened was he got a sample first, he tested it, then he

19   ordered a bigger sample, which was like 22 kilograms, and that

20   was the receipt we saw, and then he expensed it.  That is an

21   ordinary kind of thing happening in the ordinary course.  And

22   I actually have a document on that that I will get to in a

23   minute.

24       But despite all the bluster about UNO's supposed copying,

25   Kaneka really didn't present any evidence of it.  I had

1    to -- Remember Dr. Jacobs got up here and testified under

2    Mr. Dain's questioning.  Not a word about copying.  I had to

3    practically pull it out of him on cross examination.

4        "So, Dr. Jacobs, you have these three little documents

5    that you rely on for copying, and what do they show?"

6        One shows what?  They tested the physical characteristics

7    against Unolon GD.  Well, there is really nothing wrong with

8    that.  Then they got the Samyang report after they got the

9    flame retardant test.  The Samyang report only said they had

10   bromine.  And then there was a third thing.  That was sort of

11   the Natura development history.  And Kaneka says, "Well, look

12   at that.  The first entry is testing Kaneka's fibers."  But

13   that test was for just the physical properties.

14       At any rate, I asked him, "All three of those taken

15   together, knock yourself out, Dr. Jacobs, does that show

16   copying?"  And he says no.

17       "Take these documents together.  Would you agree with me

18   that these three documents do not have sufficient information

19   to allow UNO to have made a copy of the Kaneka fiber?"

20       "Those documents do not."  That was his answer.

21       So even with those documents together, there was not

22   enough proof, no proof really, that there was any copying.

23   The only evidence really is that the fiber by UNO was

24   independently developed.

25       Next slide.

1       And then Mr. Masuda, you know, if anybody copied, Kaneka

2   copied, and they copied the prior art and they copied other

3   competitors' fibers.  What did he say?  He said -- Now, we

4   asked him, "Your team wasn't aware of UNO's PET fiber, was

5   it?"

6       "Not until we filed for the patent."

7       And then I said, "Well, that was July of 2003?"

8       "Yeah, even at the time we filed for the patent with all

9   the documents we still didn't know."

10      Next slide.

11      And because you didn't know about the fiber, you

12  certainly, then, didn't test it, did you, back in 2002" [sic].

13      "Right."

14      Next slide.

15      "So that really wasn't true, was it?"

16      Here is DTX 1756.  This is a document that his lab

17  partner Mr. Shiga prepared.  That is in the top.  This is

18  December 2005 [sic].  "Analysis of competitors' filament

19  material number two.  Product manufactured by Unolon."  So

20  even though Masuda said didn't know, didn't test, the

21  documents show the contrary.

22      Next slide.  And then if I could have DTX 1758.  Here it

23  is.

24      And then here is the results of that analysis that

25  Mr. Shiga requested.  "Unolon solely made of PET.  Two resins

1 made by Seiwa had the same composition." I think it is a lot

2 different from in the knowing.

3     Then I showed him this slide, this document DTX 1759, I

4 think. And here is this testing of Unolon GD. We know it is

5 GD. Why? Because we asked him about this value here Tmax.

6 Here it is down near bottom. And it says 241 degrees, and

7 that is Celsius. It turns into 465. High heat resistant

8 version of Unolon's PET fiber. And so they did that.

9     So instead of not knowing about UNO they did know about

10 UNO. They knew about their fibers. And why? They didn't

11 have a PET fiber at the time. Kaneka was looking to develop

12 their own. And I am sure they used this to their benefit.

13     And it wasn't just that. And then we had --

14     Next slide.

15     During the prosecution of the patents, Kaneka amended

16 their patent claims and they said, you know, instead of a

17 flame retardant fiber, artificial hair formed from, that would

18 be something like a recipe--if you had a recipe, they would be

19 formed from--they changed it to comprising, 100 parts per

20 weight, so forth and so on. They did that after having

21 detailed information of UNO's fiber from Masuda's testing.

22     And then you saw this little film clip of Ms. Mizutani,

23 their IP department person, and we asked her, "Have you ever

24 suggested modification of the claims of the asserted patents

25 based on information you've obtained about UNO's products?"

1     "Yes."  She said yes.

2     Next slide.  I guess I don't have another one.

3     She said yes.

4     Now, think about that.  You know, what they are trying to

5  do in this case is fit these claims to my client's fiber.

6  Right?  And they did that and they changed the language of the

7  claims after they knew about the fibers.  It is sort of buying

8  a lottery ticket after the numbers are already announced.

9  Right?  Wouldn't we all love to do that?  Well, that is kind

10  of what they did here.  They changed the claims after they

11  knew something about UNO's fibers.

12     Again, there is no contrary evidence to UNO's independent

13  development.  Kaneka tries to argue that somehow UNO

14  short-circuited their development process because of this, and

15  so forth, but really that just doesn't hold up.  Mr. Jacobs

16  even admitted that the documents and the information they had

17  wasn't enough.

18          THE COURT:  Mr. Woo, I hate to interrupt, but let's

19  take about a 10- or 15-minute break.  We will come back and

20  finish up.

21          (Whereupon, the jury left the courtroom.)

22          THE COURT:  Take a shorter break.  Let's take about

23  15 minutes.

24                    (Brief recess.)

25          THE COURT:

1          THE COURT:  Mr. Woo, let me see counsel up here a

2     minute.

3          (Discussion at the bench, out of the hearing of the

4          reporter.)

5          THE COURT:  Go ahead and bring in the jury.

6          (Whereupon, the jury entered the courtroom.)

7          THE COURT:  Mr. Woo?

8          MR. WOO:  Thank you, Your Honor.

9     So I am going to try and speed things up because I am

10    starting to run out of time, too.

11         So the next thing I wanted to talk about was this part of

12    Dr. Jacobs' testimony where I asked him whether if we added

13    Toray '668, the composition that is exactly the same as the

14    patent, to Unolon GD, would that have the exact composition as

15    the Kaneka fiber.  And he sort of hedged a little bit.  He

16    said, "If it were added in the right quantity and they used

17    the right molecular weight range and did everything else

18    exactly as Kaneka did, yes."  And the problem with that for

19    Kaneka is that the existing PET fiber, Unolon GD, was already

20    in the prior art, and so was the '668 Toray composition.  And

21    all that really proves is that the patent is invalid.  Right?

22    Because people going out there to look -- again, to look for

23    the right flame retardant would -- just they were directed to

24    the Toray book which said use it, use brominated epoxy with

25    PET.  There was a Sakamoto reference that had that chart that

1    said, you know, it is very good to use with PET.  And someone

2    would have been directed to then go to the '668 Toray and say,

3    "Look, I have the same stuff."  That is not hindsight.  That

4    was all knowledge in the art, to people of skill of the art

5    had available to them before 2003.

6        So the next thing I wanted to talk to you about is how

7    the patent office application process is private.  It is a

8    long time ago now that you saw the patent video, and they

9    explained to you that the patent application process is

10   private.  Somebody like Kaneka goes and applies for a patent,

11   nobody can see what is going on in that process until the

12   patent actually issues--in this case in 2010.  We, we, my

13   client and I, were not there in that process.  Can you imagine

14   how it would be if this trial were conducted with just

15   Mr. Dain and Mr. Taylor on that side and we weren't in this

16   courtroom?  It would be a very one-sided thing.  And that is

17   what happens in the patent office.  So the patent office,

18   because of its relative scarce resources -- you know,

19   sometimes they are like the DMV.  They sometimes issue

20   licenses to people that shouldn't have them.  And in this case

21   you can see how the resource-constrained government agency may

22   miss things, especially a patent and materials that are in

23   Japanese and in foreign countries that they can't necessarily

24   search for on their own.  So they depend a lot on the

25   applicants to tell them the development the prior art.  And as

1    we all know, it was probably said too many times probably,

2    Kaneka didn't tell them about Toray.

3         Next slide.

4         And, you know, Kaneka says, well, you know, UNO, the

5    Defense, we pick too much on the little things.  Each piece of

6    the invention was already in the prior art.  No big deal

7    because it wasn't for hair.  But the fact of the matter is

8    none of the inventors could really articulate what their

9    inventions were.  We asked -- this testimony was read into the

10   record because, you know, we were running out of time, but we

11   were asking -- Here is Mr. Masuda.  He was on the stand.  "We

12   were not the first person to conceive of making a fiber

13   containing PET and brominated flame retardant.  Correct."

14        Next slide.

15        And we asked Mr. Shiga a similar question.  "Did you

16   invent polyester fibers using brominated epoxy flame

17   retardant?  Are you the first to conceive of this?

18        "I don't think I invented the use of brominated epoxy

19   flame retardant."

20        Next.

21        "Can you describe in your own words what your invention

22   is that is the subject of these patents?"

23        "You're asking me to explain what the invention is?"

24        "Yes.  What is your invention?"

25        And the answer is, "I don't know what part of this patent

1    is -- my invention is."  That is Mr. Shiga, another one of the

2    inventors.

3         Mr. Shinbayashi, also read into the record, "How did you

4    come to invent the fiber of claim 1 of the '429 Patent?"

5         "I don't know."

6         "Were you involved in the decision to utilize brominated

7    epoxy as a flame retardant?"

8         "I don't remember.  I do not remember."

9         Now, and then he says, "Does Kaneka sell any products

10   that embody claim 1?"

11        "It should be done by a patent professional.  Whether

12   Kaneka sells a product embodying claim 1 or not, I do not

13   know."

14        "When did you conceive of making artificial fibers

15   comprised of these materials?"

16        "I don't recall."

17        And then he goes on.  "Do you know if any examples in

18   table 1 of the patents fall within the scope of claim 1?"

19        "I cannot make that judgment.  I don't know."

20        "Do you know if any of the examples in table 2 fall

21   within the scope of claim 1?"

22        "I don't know about table 2 either."

23        "How about examples of the '429 Patent?"

24        "I don't know."

25        Next.

1          So before we move on to that, every inventor I have ever

2     met this is very, very proud of their invention.  They can

3     tell you immediately what their invention is about.  "I

4     invented the world's best squirrel trap," or "I invented the

5     world's best supercomputer."  They will tell you in the first

6     ten seconds, and then they will probably tell you for the next

7     two hours.  But to have inventors under oath not be able to

8     articulate what their invention is, that suggests that it

9     wasn't an invention at all; it was just, again, sort of the

10     normal testing of -- routine testing of something that was

11     known.  PET was known, brominated epoxy was known, the prior

12     art pointed to the use of that as being good, they tested it,

13     and it worked fine.  But that is not an invention.

14          Next.

15          Now, Mr. Masuda, we asked him, "What other flame

16     retardant polyester fibers for artificial hair were being sold

17     in the market at the time you applied for the patent?"

18          And he said, "Well, back then there were no flame

19     retardant polyester fibers sold in the market."

20          And then we showed him the next exhibit, DTX 1107, and it

21     show turned out, according to their own records, they tested a

22     number of them, including the Toray fiber of flame retardant

23     polyester.

24          And then if I can have the next, please.

25          And then we have the person of ordinary skill in the art.

1    Now, this is something I touched on before.  A person of

2    ordinary skill has all these qualifications, including all

3    this education shown here.  This person would have also work

4    experience in the field of polymer science, they would know

5    about melt spinning, fiber spinning, they would have an

6    understanding how polymer structure and composition imparted

7    gross physical properties onto the fiber.

8        Next slide.

9        And that would include flame retardance, heat resistance,

10   all these different curling kinds of things.  So, in other

11   words, they would be familiar with all these things.  So they

12   would know how to make a fiber, they knew how to make a fiber

13   at least as good at what was already in the market, my

14   clients' Unolon GD, and the only question is which flame

15   retardant do you use.

16       Next.

17       Now, it seems obvious to all of us.  Right?  You have got

18   a fiber, and you want to make it flame retardant, you add a

19   flame retardant to it.  Which one?  One that is compatible.

20   And Dr. Jacobs, we asked him.  He says, "Well, now it may seem

21   today that to combine those two would be obvious, but I think

22   before I got involved in this case I might have thought the

23   same thing."  But then he says, he qualifies it and says,

24   "Well, but then I saw how much work they put into it and how

25   long it took them to find the right one," and so he changed

1    his mind about whether or not it is obvious.  But the fact of

2    the matter is, it didn't take Kaneka a long time.

3         Next slide.

4         Mr. Mihoichi, Kaneka's corporate representative, said

5    that, "Look.  In April of 2003, the FPW Group intended to

6    transition towards developing a polyester fiber utilizing

7    brominated based flame retardant.  Roughly speaking that was

8    the case."

9         So again, this whole period of time to 2000 to April 2003

10   they were looking at things that didn't have bromine in it, so

11   they were barking up the wrong tree.  They weren't following

12   the advice of the manufacturers and what was in the prior art.

13   They were looking at non-brominated based ones.  So if you are

14   looking at the time of actual development of a bromine based

15   flame retardant with PET, it was only April of 2003 to July

16   2003 when they applied for the patent.  May, June, July, three

17   months, which is roughly the period of time that it took UNO,

18   after being told by P&C about brominated epoxy, to develop the

19   same thing.

20        So basically, again, you know, the sameness can't be

21   denied.  Both companies  asked flame retardant manufacturers

22   what the recommendations were for a flame retardant used with

23   PET, and they recommended brominated epoxy to use with PET.

24   UNO asked P&C, and there is evidence that Kaneka asked

25   Sakamoto.  They knew that from the Toray book.

1        Next slide.

2        Let's see.  DTX 1139.  This is the spec sheet.  And you

3    may recall this is what Dr. Jacobs said that a person of

4    ordinary skill would know about.  And he said, "Look.  You

5    know, all these highlighted attributes I have in this

6    document, minimal heat yellowing, being light resistant, and

7    good color, and so forth, all those things would be good for

8    hair."  So, in other words, a person with skill in the art

9    looking at the spec sheet back in 2002, 2003, would say, "Hey,

10   you know, this looks pretty good.  I should use this for my

11   hair."

12       And you remember Mr. Dain focusing in -- on his teaching

13   away argument he focused in on the part of the slide of some

14   prior art reference that said, "Hey, you should watch out for

15   using brominated or halogenated flame retardants because they

16   could be dangerous"?  But by 2002, 2003, it was well-known

17   that this particular flame retardant didn't have that problem.

18   In fact, it says so right here.  "Although brominated

19   generation of harmful substances, such as dioxins, is

20   minimal."  So it was safe.  And it includes all the other

21   things that you would look for and want if you were trying to

22   figure out which flame retardant to use would, it have been

23   available and was spelled out in this reference.

24       Now, to try and show that the claimed invention was not

25   obvious, Kaneka says to the patent office, "Well, we got

1    unexpected results.  When we added the brominated flame

2    retardant we got a better product."  Well, and I apologize for

3    this because there is a lot of documents that you are going to

4    get in the jury room, but there is no evidence that it got

5    better results.  What happened was --

6        Can I have the slide up, please?

7        What happened was -- What happened was Kaneka told the

8    patent office that their brominated epoxy flame retardant and

9    PET combination was better than a phosphorus based flame

10   retardant PET combination.  And they submitted that to the

11   patent office.  And they told the patent office, "Look, here

12   is our wonderful invention.  It is unexpectedly better over

13   phosphorus based flame retardant for hair."  And it shows you

14   all these bad qualities--bad combing, bad feeling, only fair

15   gloss, smooth feeling bad, et cetera.  But that isn't what

16   they really knew.  And actually --

17       Next slide.

18       They knew from their own testing that there was at least

19   one phosphorus based flame retardant with PET that would work

20   just as well as their patented invention.  That is what

21   DTX 1672 says.  They tested the phosphorus based against their

22   own brominated epoxy, and all the tests are all about the

23   same--good, great, 4.8, good, good, good, slightly glossy, on

24   par with their claimed invention.  They didn't tell the patent

25   office about that.  Remember Mr. Masuda admitted that.

1        Next slide.

2            And, you know, then their next excuse was, "Well, I had

3   this ah-ha moment where I was going to -- I thought, well,

4   what if I matched the flame retardant refractive index with

5   the refractive index of the PET?  Wouldn't that be great?"

6   But we asked him about that as well.  They weren't looking for

7   that.  What with they were focused on -- They were not focused

8   on refractive index.  "That was not the way I tried to select

9   the flame retardant."  They wanted to look for one that would

10  mix adequately with PET.

11           I don't know if there is another one or not.  Yes.

12           And then they wanted to find one that would not decompose

13  the PET.  That is what they were looking for.  It wasn't this

14  ah-ha moment, wonderful results.  It was one -- it wasn't an

15  improvement.  It was just better over the phosphorus, which

16  turns out not to be true, and then it turns out that the only

17  criteria they were really looking for was whether it would mix

18  well and whether or not it would degrade the PET.

19           Can I have the next slide?

20           And then I think they have argued to you in this case

21  that brominated epoxy was the one that worked well, but that

22  wasn't the case; that the phosphorus based one worked just as

23  well.

24           If I can see -- I think we already saw DTX --

25           So I don't think I have time to go through all the slides

1    for Dr. Ellison.  He showed you how much prior art there was

2    and how it spread exactly on it.  And you will see -- In your

3    jury room you have DTX 1775.  Those are the slides.  You will

4    be able to study them carefully and come up with your own

5    conclusions.

6        What I want to focus on now is -- because I don't get a

7    chance to talk to you anymore after this.  My time runs out in

8    a few minutes.  Mr. Dain will have his closing remarks in

9    rebuttal, and I don't get a chance to talk to you again, so

10   what I want to do is try to preview what I think he might try

11   to argue, and I trust you to make the right judgment.

12       What they argue is that there was a long-felt need for

13   the hair, but again, as we saw from Mr. Mihoichi, Kaneka spent

14   time looking in the wrong direction.  There is no evidence

15   that anybody wanted flame retardant hair until December '03

16   when my client was told by Boyang that they wanted a

17   version -- a flame retardant version of their existing fiber.

18       The other thing that they keep saying is that Toray is

19   not for hair, but, again, we saw from the Toray teachings it

20   was for fiber and they had a brominated thing and they had it

21   in the book and it was all recommended.

22       They also say unexpected results; you know, adding this

23   material enhanced the qualities, but as we saw, that wasn't

24   true.

25       And, in fact, if I could have the DTX 1480 up.

1      This is the declaration that Mr. Mihoichi submitted to

2   the patent office to try to convince the patent office they

3   had unexpectedly good results.  And, again, you can see this

4   in the jury room.  There is nothing in this document that says

5   that adding the brominated epoxy flame retardant made the

6   fibers better.  It just gave a comparison with --

7      Next page.

8      It just gave a comparison chart of phosphorus based flame

9   retardants and PET, and it showed that --

10      There is another chart.  There we go.

11      And this one showed that they had bad results.  But,

12   again, we know that, from that other document I showed you,

13   Kaneka had good results, and they weren't telling the patent

14   office this.  Instead they were telling the patent office they

15   got bad result with phosphorus.

16      Can I have PTX 833?

17      And they also told you the same thing.  There was that

18   board they showed you with the color chart on it.  They said,

19   "Look, our brominated epoxy flame retardant fiber was really

20   good and phosphorus was really bad."  All these red boxes.

21   But that wasn't true.  They had test results showing that that

22   phosphorus based flame retardant was just as good.  And here

23   it is on this slide, DTX 1672.

24      Next slide.

25      And then Mr. Mihoichi, you know, just to make sure that

1    we are not reading the charts wrong, we asked him, "So this

2    PET fiber made from BCA"--that is the phosphorus based flame

3    retardant--"resulted in a good artificial hair product,

4    correct?"

5         "Yes, that's correct."

6         "And did it meet the goals of the group?"

7         "In terms of quality, I think it was at the level that

8    could be used as artificial human hair material."

9         That is hardly consistent with their story here now that

10   brominated epoxy was this magical stuff; the only one that

11   would ever work.  They actually -- Kaneka actually found one

12   that worked with phosphorus instead, and they didn't tell the

13   patent office and didn't tell you about it until I showed it

14   to you.

15        Now, next slide.  And this is -- I think we have this

16   already.  Next.  And next.

17        We worked on these last night, so I apologize for how

18   rough they are.

19        And, again, here is the Toray book which disclosed the

20   flame retardants that were copied into the patent again.  This

21   shows that nothing was unexpected.  In fact, everything should

22   have been expected because the book told you to expect good

23   results with PET.

24        Now let's look -- If I could look at DTX 1003.

25        And here is what they told the patent office about the

1    Dainippon Ink '713 Patent, which is one of the prior pieces of

2    prior art that Dr. Ellison talked to you about.  And this

3    one -- You know, this one, the only thing that they picked on

4    was it didn't have the right molecular weight, but everything

5    else was there.  Dainippon Ink was about fiber, it was about

6    the PET fiber in particular.  It had brominated epoxy flame

7    retardant.  It had the right structure.  The only thing that

8    was, quote unquote, missing was the high molecular weight,

9    this degree of polymerization--30 to 150.  And here it is

10   where they are saying, "Iizaka"--which is the Dainippon Ink

11   reference--"fails to disclose the a compound which M is 30 to

12   15, as claim 1 requires."

13        Can we have DTX 1029 up?

14        Here is the Dainippon Ink reference.  This patent is

15   about high molecular weight, and there is this halogenated

16   biphenyl, that is sort of the chemist name for the same thing

17   brominated epoxy.  So this patent is all about high molecular

18   weight.  And Dr. Ellison calculated correctly what the value

19   was.  So the only thing that was really missing, quote

20   unquote, according to Kaneka was this high molecular weight.

21   Well, actually this reference did have the high molecular

22   weight.  They were telling the patent office something

23   different.

24        Again, I am running out of time so I won't cover the

25   Ellison slides.  I know we have a high burden of proof on it,

```
 1    and I really wish I had a chance to show them to you.  But you

 2    saw them, you heard from Dr. Ellison, and the bottom line is

 3    one of the reference combinations involved Toray, and we know

 4    what happened with Toray--it wasn't disclosed to the patent

 5    office, never got a chance to see it, but it clearly had the

 6    same composition as the patented invention.  And combined with

 7    the other references, the person -- the learning -- the

 8    knowledge of persons of ordinary skill in the art, they would

 9    have known, it would have been obvious to them to use

10    Dainippon Ink '713 with one of those other references to

11    combine that to come up with the invention.

12        I sort of -- It is hard to think of the right analogy,

13    but how do you describe it to someone that something is

14    obvious.  You know, what is -- I guess one way it is obvious

15    is if you are thinking about a person of skill in the art

16    sitting in a room with all the prior art along the walls, and

17    you are thinking, "Okay.  I have got this fiber.  What do I do

18    with it and how do I make a flame retardant, because someone

19    has asked me to do that now?"  And I look at the prior art and

20    I say, "Well, that one is telling me that I should go to

21    Sakamoto and I should talk to them because it would be good

22    with PET."  It says "very good" in this book.  And then I go

23    to Sakamoto and they give me the spec sheet, and the spec

24    sheet says, "Wow, you know, this is great for hair."  And

25    Dr. Jacobs agrees.  "And so I will at least try that."  And,
```

 1    in fact, it turns out that not only do I just try that, but it

 2    works perfectly.  And that is not an invention.

 3         Now, before -- I want to spend the last few minutes

 4    talking about the verdict form.  But before I do that I want

 5    to mention something about damages.

 6         If I could have PTX 115 up, please.

 7         This is the spreadsheet that Mr. Nolte talked to you

 8    about.  Again, his entire opinion comes down to this one

 9    spreadsheet.  And he says, "Well, this was prepared in the

10    ordinary course of business.  It has all the right numbers for

11    2010, '11, and '12, and that is what I base my opinion on."

12    And, you know, he was asked, "Well, how do you know that?"

13    And he said, "Well, they told me that these were prepared in

14    the ordinary course of business."  We don't know whether

15    "they" means Kaneka or "they" means the lawyers for Kaneka.

16    But what we do know is that Mr. Doi comes on the stand

17    afterwards and says, "Were they prepared in the ordinary

18    course of business?"

19         "No, they weren't.  They were not."  He says that they

20    were prepared for the litigation.

21         So I always wondered about that.  They called Mr. Nolte

22    first and then called Doi second.  If it was the other way

23    around and Mr. Nolte was in the room when Mr. Doi was

24    testifying--it is like we had our experts in the room

25    listening to other people testify--he would not have been able

1   to say that.

2       But let's look at what the other documents show.  Let's

3   have PTX 114 up with this document.

4       PTX 114 was a document that was produced to us earlier in

5   the case.  It was also represented as something that was

6   prepared in the ordinary course of business.  And if you look

7   at the numbers, and you may recall this testimony under -- by

8   Mr. Doi under examination by Mr. Marton, that the numbers are

9   far different.  The numbers that we originally got for 2010,

10   '11, and '12 were fractions of the numbers that we got from

11   Mr. Nolte in his report prepared for the litigation.  It was

12   two times the number for 2010, three times for 2011, and four

13   times, roughly, for 2012, or three times for 2012.  Whatever.

14   But you can see this for yourself.  It looks to us like they

15   just amped up the numbers for the litigation.

16       And contrary to what Mr. Dain keeps arguing, we did

17   produce our documents in this case.  They had them.  Kaneka

18   had them.  They showed them to you throughout the case.  They

19   cross examined our witnesses with them.  And you will see that

20   the numbers in the litigation version of this chart, PTX 115,

21   for 2010 roughly approximate the numbers that are in our own

22   documents that are based on projections, not actually sales.

23   So whether they did this on purpose, I will leave that up to

24   you to decide, but I wanted to make sure that you knew that.

25       Now, if I could have the verdict form up.

1          A couple of things I want to talk to you about on those.

2     In particular, Question No. 1 of the charge.  And I apologize.

3     I don't have it nicely tabbed as Mr. Dain did.  Question No.

4     1, "Has Kaneka proven it more likely than not that every

5     requirement of claim 1 of the '429 Patent is included in this

6     product," and so forth.  And a couple of things to mention

7     here.  Every requirement, so for both this '429 Patent and

8     the '430 Patent, every element has to be met in the product.

9     And you might remember Dr. Jacobs saying, "I tested all the

10    products and there was -- I couldn't find any human hair for

11    the '430 Patent."  That is what he said.  And so there is no

12    proof that there is any infringement of any of the products

13    that he looked at with respect to the '430 Patent.

14         Be that as it may, every one of them requires the linear

15    brominated epoxy flame retardant, and that is not present

16    because of the high degree of branching.  So the correct

17    answer for all of these questions here is no.

18         The other thing about this is that there is this concept

19    called direct infringement and inducement.  And I know it is a

20    complicated legal concept, but direct infringement is when

21    someone sells something directly into the United States.  If

22    UNO sold its fibers to a wig maker in the United States, that

23    would be -- and it had met all the requirements, it would be

24    infringement.  That is not the case.  What we have here is all

25    the sales, uncontroverted testimony, all takes place outside

1   the United States.

2       So what happens for infringement?  Well, to prove

3   infringement you have to have the specific intent to induce

4   infringement by somebody else bringing it into the United

5   States.  So the only evidence we have gotten in this case so

6   far about that kind of level of knowledge and intent -- and,

7   again, this all has to be after the patent issued.  So,

8   remember, they showed -- Kaneka showed you all those trade

9   fairs and everything?  All of that took place prior to the

10  patent issuing.  If you look at post-patent issuance conduct,

11  there is hardly any of anything.  There is a relationship with

12  Mr. Jhin and his company.  That is about it.  We heard about

13  the other importers, like Sun Tae Yang and Eva Gabor and so

14  forth and so on, but there is hardly any proof, if any, that

15  those entities actually imported any of UNO's fiber products

16  into the United States.

17      And it is their burden.  Again, they have every tool

18  available to them to go out and subpoena the importers, the

19  U.S. importers.  Maybe it is tougher to get at the Chinese wig

20  makers, but you can certainly at least get to the importers,

21  and they never did that.  There is no evidence of their

22  involvement and conduct in this case.  And so when it comes to

23  matching it up, you know, what was directly infringed, what

24  products of these other companies that are not Defendants

25  here, hardly ever heard of in this case, what evidence is

1    there of them bringing which product of ours--that is the UNO

2    products, Unolon or Natura, whatever--into the United States?

3    It is their burden.  Again, if they don't prove to you that it

4    is more likely than not that that happened, and in the

5    quantities, the huge quantities that show up in PTX 115, then

6    you are completely entitled to give them nothing, even if you

7    thought there was any infringement; even if you thought the

8    patents were valid.  But I think the evidence shows that the

9    patents are not infringed and the patents are not valid.

10        The other thing about --

11        Let's look at Question 5.

12        Question No. 5 is the -- This is the inducement question.

13   UNO has to have taken action during the patent being in force,

14   intending to cause somebody to infringe the patent.  And they

15   also have to be aware of the patent and knew that the acts

16   would constitute infringement.

17        Now, you heard Mr. Dain say, "Well there is no  -- The

18   Defendant is going to say, "We had a good faith belief and

19   where is the good faith?"  Well, they never gave UNO a chance

20   to form a good faith belief before suing them.  Kaneka sued

21   UNO and the other Defendants the same day the patents issued,

22   so there was never any chance for UNO to get a copy of the

23   patent, the U.S. patent, and say, "Gee, you know, I think we

24   don't infringe," or, "Gee, the patent is not valid."  They got

25   sued the same day.  So the only evidence of good faith is

1    through the good faith assertion of the defenses in this case.

2         So even if you somehow don't find that the defenses are

3    believable, you don't think that -- you somehow believe

4    Dr. Jacobs when he says everything is linear when he has not

5    done the testing, or somehow that the patents are not valid,

6    they weren't obvious, if you find that it was done -- our

7    assertions are in good faith, they don't meet the standard of

8    proof for inducement.

9         And then when it comes to damages, I invite them, invite

10   you, to try and match up the instances of direct infringement,

11   the importation by Sun Tae Yang and Eva Gabor and all those

12   other companies to products that UNO -- that have UNO fibers

13   in them that made it to the United States.  I don't think they

14   can do that.  They are going to try and try and show you that,

15   and maybe they will when Mr. Dain gets up and tries to rebut

16   my presentation, but I think that is going to be really hard

17   for them to do.

18        And then when you get to -- I wanted to get to page 33,

19   if I could.  And if I can get to the bottom part of this,

20   because I think that is the most important part.

21        This is about obviousness.  Again, the test for

22   obviousness is what is -- you know, what is the state of the

23   prior art; what are the differences over the prior art, and is

24   it just that little missing piece of the puzzle.  And whether

25   it is or not, you should take into account these kinds of

1    factors.  Not all of them go the same way.

2        One is whether the claimed invention was merely the

3    predictable result of using prior art elements according to

4    their own functions.  Flame retardant is flame retardant.  It

5    acts as flame retardant.  It is a predictable result within

6    the known function.

7        Whether the claimed information provides an obvious

8    solution to a known problem.  Well, yeah, if you wanted to

9    make PET flame retardant, brominated epoxy was the way to go.

10       Whether it teaches or suggests a desirability of

11   combining the elements.  Yeah, it does.  All those references,

12   the Toray references collectively certainly show that you

13   should use a brominated epoxy with PET for fiber and for fiber

14   for hair.

15       Whether the prior art teaches away.  Now, this is where

16   Mr. Dain says, "Well, brominated epoxy is poison."  Well, that

17   was old.  Actually the bulk of the art shows -- modern art

18   shows that that is not true.  It doesn't teach away.

19       Five, whether it would have been obvious to try to

20   combination of elements.  And certainly that is true here.

21   All the recommendations that everybody gave to both

22   manufacturers was to use brominated PET.  It is obvious to try

23   it.

24       And there are a finite number of identified predictable

25   solutions.  Yeah.  Kaneka keeps talking about the thousands of

1    thousands of flame retardants, but the fact of the matter is

2    they asked the flame retardant manufacturers, and the instant

3    they say brominated epoxy.  Finite number.

4        And then whether the change resulted more from design

5    incentives or other market forces.  That is true here, too.

6    Nobody really wanted it until the customers asked for it and

7    that is it.

8        Now, there are another set of factors below that; again,

9    very complicated, we talked about them throughout this

10   presentation--whether it was commercially successful, whether

11   it satisfied long-felt need, and so forth.  Not all of these

12   are cut the same way.  You have to decide whether or not --

13   which way they go.  But D, whether others invented the

14   invention at roughly the same time, that is actually a fact

15   that cuts in our favor.  The fact that incidentally somebody

16   asked you to do something, you talk to the manufacturer, they

17   tell you what to use, you do it, and it is easy to do at

18   roughly the same time, and that is an indication that the

19   patent is obvious.

20       So, again, I think the answer to non-infringement for all

21   the questions -- rather, to the question for infringement, the

22   answer is no to that for all the fibers, because all of our

23   fibers have this linear -- this non-linear branched flame

24   retardant.

25       The patents are invalid because they are obvious, so the

1  answer to the question of whether it is invalid, the answer

2  should be yes--a finding for the Defendants.

3       And when you get to the last page, I don't think you need

4  to get to the last page because it is on damages, but on

5  damages where is the proof?  There is no proof.  They had

6  every -- They are good lawyers.  They have every means

7  available to get the proof.  They didn't present it to you.

8  And even if you should find the patent is infringed and valid,

9  they don't prove it to you what their damages are.  Feel free

10  to give them zero.  Feel free to give them some portion of the

11  580 that Mr. Burns talked about.  It is entirely up to you.

12       Kaneka doesn't want you to know the whole story about

13  this.  They have been telling sort of half the story

14  throughout the case.  Their witnesses -- Mr. Masuda talked

15  half truths most of the time.  Mr. Dain on cross examination

16  kept cutting off my witnesses; kept yelling at them.  They

17  don't want you to know the truth here.

18       Accusations are easy to make.  They are hard to defend

19  against.  I know I have said a whole lot.  I know that there

20  is -- You know, he is going to come back and say, "Mr. Woo is

21  trying to make up -- throw spaghetti at the wall to see what

22  sticks."  I think that is an indication their case is weak.

23  There are many, many problems with it.

24       I know that you have been very patient.  There are a lot

25  of smoke screens that Kaneka has thrown up.  Copying is a

1    sidetrack.  It is not relevant to infringement.

2        They chide our experts for somehow not being experts in

3    their disciplines, but they are on the way -- for the things

4    that count, the composition of fibers.

5        I can't be in there with you, of course, to deliberate

6    with you.  I trust that you will faithfully exercise your

7    duties, follow the law.  They don't get anything unless they

8    prove every element.

9        I want to thank you again for your service and thank you

10   for your time.

11           THE COURT:  Thank you.

12       Mr. Dain?

13           MR. DAIN:  Thank you, Your Honor.

14       Actually now I am hungry for spaghetti, so I will try to

15   make this quick.

16       I am going to use Mr. Woo's chart here.

17       What is the first thing that is on here?  Flame retardant

18   polyester artificial hair.  First thing he got up to you and

19   said, "You could put a mop on your head and that is all the

20   Plaintiffs invented."  It is always a partial example of what

21   this case is about.  We are talking about artificial hair.

22   Okay?  We are not talking about mops or anything else.

23       The patent office had this Dainippon patent right before

24   it.  They have a chemical engineer.  That person rejected it.

25   That person rejected it in favor of the patent.

1      Even Dr. Ellison didn't list the Toray patent as his best

2   piece of prior art.  Everybody who submits a patent to the

3   office has to make their own determination of what they think

4   is relevant.

5      So along those lines, what is the one question that

6   Mr. Woo didn't answer?  And it was raised by Dr. Jacobs.  If

7   this was so obvious, why didn't anyone else come up with it

8   before Kaneka?  If it was so obvious, why didn't the millions

9   of patents that came before ever have the reference that

10  Kaneka had?  Why didn't UNO come up with it before?  And in

11  fact, that is kind of -- takes nerve to the highest standard

12  to say, "Well, if we can show someone else came up with it at

13  a close time, and that ought to tell you it is easy."  But the

14  reason UNO came up with it is they just copied it.

15     And they are still copying it today.  If there were other

16  flame retardants that are so fantastic, why are they still

17  doing it?  Why didn't they just change and we wouldn't be

18  here?  It is because this is the flame retardant that performs

19  all these functions.

20     And I am going to use the same slide that -- It is in

21  your instruction.

22     Can we turn to page 33, please, Michelle?

23     And this is what all their experts did, the part to keep

24  in mind, if you can go down there, and what Mr. Woo did.

25     It is easy in hindsight to say, "You just grab this and

1    you grab this."  No person of ordinary skill in the art is

2    sitting in a room with a wall of prior art around them.  It

3    just doesn't happen that way.  So you look for prior art in

4    your field.

5        So here is the Judge's instruction to you.  "Keep in mind

6    that the existence of each and every element of the claimed

7    invention in the prior art does not necessarily prove

8    obviousness."  So just because you can pick apart other

9    patents and say, "Well, if you take this from this and this

10   from this and this from this, you get, you know, Leonardo da

11   Vinci's invention."  You could do that, but that doesn't prove

12   obvious.

13       "Most, if not all, inventions rely on building blocks of

14   prior art."  I mean, what is that telling you?  Again, we

15   don't have to invent the flame retardant to use a flame

16   retardant in our invention.  We don't have to invent polyester

17   fiber to use a polyester fiber in our invention.

18       It says, "In considering whether a claimed invention is

19   obvious, you may, but are not required, to find obviousness if

20   you find that at the time of the claimed invention there was a

21   reason that would have prompted a person having ordinary skill

22   in the field of polymer chemistry to combine the known

23   elements."

24       And here is the key, once again glossed over by Mr. Woo.

25   The person of ordinary skill has to be trying to make

1    artificial hair look like human hair.  Has to be.  Not

2    somebody else.

3        So what he just took a second to go over, if you go to

4    page 34, is what are called secondary considerations.  And

5    here is what happens.  We are here, you know, years after the

6    patent issues.  And, of course I could do it, they could do it

7    if I were on their side.  They get up and say, "It is obvious

8    looking back, because now we know all these pieces we can put

9    together and it is obvious."  So what the law has developed

10   are secondary considerations that you can take into account.

11       And highlight the A through I at the bottom, please,

12   Michelle.

13       So what happens is, let's say you can take this piece of

14   prior art and this piece of prior art and put it together and

15   get what we invented.  If that were the only test, no

16   invention ever, ever would be patented, because there are

17   millions and millions of patents, and I guarantee you I could

18   take a piece of every one of those things and make every new

19   invention that comes up.  So what they look for, what the law

20   looks for is, well, let's see.  If the invention was

21   commercially successful as a result of the claimed invention,

22   then that must mean it wasn't obvious because you suddenly

23   came up with something that everybody wants.  We have that

24   here.

25       If the invention satisfied a long-felt need.  I don't

1    -- If it weren't for Kaneka, you would still have most of the

2    artificial fibers used for hair that would catch fire if you

3    got near a flame.  You know, if it weren't for whoever

4    invented the Christmas tree fiber with a good flame retardant

5    that still allowed it to look like a Christmas tree -- Do you

6    know how many times around Christmas you hear about trees

7    catching fiber.  Artificial trees right and left were catching

8    fire until someone came up with that invention.  If it was so

9    obvious, why wasn't it done from the beginning?  The reason

10   is, you add a flame retardant to that and it doesn't look like

11   a Christmas tree anymore.  So one had to come up with one that

12   would.  Same with artificial fiber for hair.

13        Whether others had tried and failed to make the

14   invention.  Well, we know Kaneka tried and failed in

15   everything until it came up with this.  We know that UNO

16   didn't have it.  Who knows what others were trying, but they

17   didn't create it before Kaneka did.

18        And now this is funny how it cuts the same way.  Look an

19   D and E--whether others invented the invention at roughly the

20   same time.  That actually means, if everyone is in a race to

21   do this and you were the first, it shows it is not obvious,

22   because everyone is trying just as hard as you and you got

23   there first.  So if they didn't copy it, we beat them, and we

24   beat them by a year, but that shows it is not obvious.  But

25   then right below there, whether others copied the invention.

1        You know, I don't have slide shows.  I just want to be

2    able to talk to you.  But you have got the exhibits.  You have

3    them back there.  But the very first entry in Mr. Lim's

4    notebook is essentially "We copied the invention from Kaneka.

5    We went and got it and we deconstructed it."  And Mr. Woo

6    says, "And surprise, surprise.  In a month or two they had the

7    invention."  Yeah, if you copy it, it is not so hard.  That

8    weighs in favor of this not being obvious.

9        Let's go down to g--whether the invention achieved

10   unexpected results.  He almost got there, Dr. Ellison did.

11   The very reason the patent office granted this patent,

12   Dr. Ellison admitted it, it is in the file history that is

13   actually an exhibit, the reason was that flame retardant in

14   that composition when you put it and mix it with an artificial

15   fiber for human hair achieves unexpected results.

16       And that is the same as when you see down below it, I,

17   whether persons having ordinary skill in the art of the

18   invention expressed surprise or disbelief regarding the

19   invention.  Who would have thought that a flame retardant

20   doesn't do the greatest -- you know, doesn't retard flame more

21   than any other, but it does all these other weird things that

22   flame retardants don't do?  That makes it not obvious.  That

23   is the instruction you get.  And that is to prevent people

24   from after the fact coming in and going, "I can pick this,

25   pick this, pick this, pick this, and guess what.  I have got

1    your invention."  You could have but you didn't.

2         All of these things show it is not obvious, and those are

3    all of the things that, unfortunately, doom the argument that

4    Mr. Woo makes.

5         And I could even add H, whether others in the field

6    praised the invention.  If you look through the exhibits,

7    there is actually some notebooks from Mr. Lim when he was on

8    the stand where he was taking visits to China, and you will

9    see in there little entries that he has that say the customers

10   prefer Futura.  They like Futura.  Why?  Because it is flame

11   retardant, has good color, has everything they need.  And what

12   are they asking him?  "Can you do this?  Can you make this?

13   Can you come up with this?"

14        And again, in terms of the infringement, all you have to

15   do is follow the instructions.  You don't have to listen to

16   what Dr. Spiegelberg or Dr. Grayson say about an impurity.

17   The one who first came up with noticing this was an impurity

18   was a guy who knows flame retardants--Dr. Jacobs.  But again,

19   on page 14 the Court gives you the instruction.  It is just

20   deviations normally associated with a component of a claim.

21        So if you could just highlight that again in claim 1 of

22   the -- Down.  Right there.

23        So the only one -- Dr. Jacobs recognized right away that

24   these are just deviations ordinarily associated.

25   Unfortunately now the Defense experts have to live with that.

1    So do you remember what Dr. Spiegelberg said?  He came up with

2    this idea of, "Well, their manufacturing process is what

3    causes the branching, and that is some kind of improvement.

4    It helps form the fiber."  He came up with that a week before

5    the trial started.  They all gathered together in a room and

6    say, "Well, what the heck do we do?  We have the claim

7    construction.  How do we get around that?"  So they come up

8    with this thing "We intend to cause branching."  No, they

9    didn't.  They just intended to use the same flame retardant.

10   It already has branching.  No matter how many times you

11   compound the thing, you are going to get that pearl here and

12   there that is going to be a little impurity.

13       And again, I said it once before and I don't want to

14   over-homily this whole thing, but it is.  They are using their

15   numbers like the drunk uses the lamppost--to lean on, not to

16   light up and give you any illumination.

17       You could easily say a hundred percent of these fibers

18   have some kind of impurity or imperfection and, therefore, we

19   don't do what you do.  But if that were the case, then they

20   wouldn't be using this stuff.  It wouldn't work like it works.

21   There are just simply impurities in it, but it still functions

22   the way it should.

23       And then lastly, I am not going to take up anymore of

24   your time, except I was kind of surprised by Mr. Woo's damage

25   argument.  His own expert said, "If nothing else give -- I

1    found a five percent royalty."  His own expert Mr. Burns.  He

2    didn't even argue that to you.  So when you get there, there

3    is page 44 and page 49.

4        This is Question NO. 12.  And you will see, "What lost

5    profits, if any, did Kaneka show it more likely than not

6    suffered?"  And, again, when we talk about the more likely

7    than not, it is not -- it isn't a difficult standard.  We

8    don't make it that hard for you.  You just weigh all the

9    evidence and say which is more likely than not.

10       What Mr. Woo is saying if you start at a tie, again an

11   absolute tie, then we haven't carried our burden.  But if we

12   are at 50/50 and we tip the scale to 51 percent, even slightly

13   less, we win.  That is the way it is.  I don't want to get up

14   here and say that is all we did.  I think we proved our case

15   dramatically.  That is all we have to do.  His burden to show

16   invalidity as he acknowledged, is much, much greater--clear

17   and convincing.

18       So on damages, you saw from Mr. Nolte that there are

19   $17.9 million in sales and he reduced costs, and so as of

20   August of 2012, he says $5.5 million.  And that is all you

21   have to write in on that one.  Those are the profits that

22   Kaneka would have made on those sales.

23       And it is only a two-player market.  That was the big

24   issue.  If there were 50 people in this market, we would have

25   a hard time proving it.  But what Mr. Woo seems to be saying,

1    "Because they avoided having to provide the numbers and

2    they -- and they are in Korea, and they can sell through

3    China, just don't give them anything; let them get away with

4    it.  As long as they stay in Korea and just sell to China,

5    they can keep doing it."

6         But you have to think, what did Kaneka really -- what did

7    they really improve in terms of this product?  If it weren't

8    for Kaneka, I say it again, if it weren't for Kaneka, you

9    wouldn't have all of the artificial hair fibers that are on

10   the market, that look and feel like real hair, being fire

11   retardant.  That was Kaneka's innovation to say, "We will only

12   do this if there is a fire retardant, and then we are going to

13   try to improve that."  UNO wouldn't have done that.  They

14   would still be selling that PET because it is cheaper for them

15   to make.  So if they are going to ride on Kaneka's

16   advancement, they should pay the profits that they made.  They

17   made much more than that $5.5 million.  They made much more

18   than that in profit but they should pay that to Kaneka.

19        And because there were $580,000 in sales that Mr. Burns,

20   their expert, acknowledged, we are not going to -- that is not

21   lost profit.  That already comes with UNO.  That comes under

22   Question No. 13, and that is the 15 percent royalty rate that

23   has to be paid on every sale going forward.  If they are going

24   to use -- if they are going to trade on Kaneka's patent and

25   sell these flame retardant 100 percent Natura fibers or mixed

1   fibers, however they want to mix it, all they have to do is

2   pay a 15 percent royalty going forward.

3       What I did for JBS and Jinny, and this will not be double

4   counted but you have to put it in each one.  That is something

5   that can be taken care of afterwards.  But 580,000 in sales

6   they made, you multiply that by 15 percent, and you get

7   $87,000.

8       Now, you heard UNO is defending JBS and Jinny.  UNO has

9   told them "Stay on board.  We will take care of you."  This is

10  all coming from UNO.  But what UNO is telling you is, "Don't

11  give them anything.  Don't find infringement.  Find the patent

12  invalid.  If you do that, just don't award them any damages.

13  Let us keep selling the way we are selling."  JBS and Jinny

14  aren't going to suffer anything.  That $87,000 is going to

15  come from UNO.  But it is the direct infringement and it is

16  the royalty that should have to be paid for those sales.

17      Going forward from that August date, UNO just has to pay

18  a 15 percent royalty.  And if they would pay that royalty

19  before it ever even gets to JBS and Jinny, then they wouldn't

20  have had to be here.  Only UNO would have to take care of

21  this.

22      So with that, I spent enough of your time.  I appreciate

23  what you have done, and I trust and hope that you will see it

24  the way that Kaneka cease it.

25      Thank you.

1          THE COURT:  Thank you.

2      Members of the jury, if you will go into the jury room.

3  And let me suggest that you select your foreperson and then

4  leave for the evening, and we will get the exhibits in there

5  to you along with copies of the charge, and we will have that

6  ready to go in the morning.

7      Please recall the instructions about not discussing the

8  case with anyone.  See you back at 9:00 in the morning.

9          (Whereupon, the jury left the courtroom.)

10         THE COURT:  Anything we need to address before we

11  recess?

12         MR. WOO:  No, Your Honor.

13         THE COURT:  Make sure the exhibits are ready to go,

14  and we will take them into the jury room and have the charge

15  there for them.  They will be in at 9:00.

16         (The proceedings were concluded at 4:10 p.m.)

17

18

19

20

21

22

23

24

25

1        JUNE 28, 2013.

2            THE COURT:  We are on the record here.

3        Have you had a chance to look at the question.

4            MR. WOO:  We did.

5            THE COURT:  And the jury sent out a jury question,

6    and outside the presence of the jury, counsel for both parties

7    or all parties are here, they have been given copies of the

8    question, and we need to formulate an answer.

9        Mr. Taylor, I will hear from you.

10           MR. TAYLOR:  You know, we just had an informal

11   discussion with opposing counsel, and I don't know that it

12   would necessarily be appropriate for us to point to any

13   evidence in the record.  I think that the record is sort of as

14   it is, and guidance from counsel on what to look at or where

15   they would get the base figure for the royalties, I don't know

16   if we can do that.

17           THE COURT:  You are in agreement with that?

18           MR. WOO:  We are in agreement with that.

19           THE COURT:  My proposal will be along the lines,

20   "This is a figure that you would have to arrive at from

21   consideration of the evidence that you have before you"'

22   something like that.

23           MR. WOO:  I think that is right.

24           THE COURT:  I don't think we need to give them

25   anything beyond that.

1           So let me draft something and we will bring it back for

2      you to look at.

3                        (Pause in proceedings.)

4           THE COURT:  All right.  We have got some drafts

5      here, and we will see what you think.

6           MR. TAYLOR:  I think that is right.

7           MR. WOO:  I think that is right.

8           THE COURT:  I will sign this, we will send this back

9      here and we will of course keep this for the record.

10          Anything else we need to address while we are on the

11     record?

12                       (Deliberations continue.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              V E R D I C T

2              THE COURT:  All right.  I understand we have a

3       verdict.  And so ready for the jury?

4              MR. DAIN:  Yes, Your Honor.

5              MR. WOO:  Yes, Your Honor.

6              THE COURT:  Go ahead and bring the jury in.

7              (Whereupon, the jury entered the courtroom.)

8              THE COURT:  Ms. Foxworth, I understand the jury has

9       reached a verdict.  Is that correct?

10             THE PRESIDING OFFICER:  Yes.

11             THE COURT:  If you would hand the verdict to the

12      Marshal, please, ma'am.

13          All right.  I will read the jury's verdict.

14          Beginning on page 18, Question No. 1, the jury's answer

15      with respect to each of the products listed on that page is

16      yes.

17          Question No. 2, the jury's answer is yes.

18          Question No. 3, the jury's answer with respect to each of

19      those products is yes.

20          Question No. 4, the jury's answer is yes.

21          Question No. 5, the jury's answer is yes with respect to

22      each of those products.

23          Question No. 6, the answer is yes.

24          Question No. 7, the jury's answer is yes with respect to

25      each of the products.

1          Question No. 8, Ms. Foxworth, I will need to ask you on

2     this one.  The jury appears to have circled yes, and then it

3     is marked through and then you circled no.

4               THE PRESIDING OFFICER:  That is correct.

5               THE COURT:  So your verdict is no on that one?

6               THE PRESIDING OFFICER:  That is correct.

7               THE COURT:  So the record will reflect, that was

8     your change.  Did you make that change.

9               THE PRESIDING OFFICER:  I made a mistake.  We had

10    decided, and I transposed it incorrectly.

11              THE COURT:  So the record will reflect, that was

12    your change that made that?

13              THE PRESIDING OFFICER:  Yes.

14              THE COURT:  But no, is that the verdict of the jury?

15              THE PRESIDING OFFICER:  That is correct.

16              THE COURT:  Okay.  Thank you.

17         With respect to Question No. 9, the answer is no.

18         If I didn't say it, the answer to Question No. 8 is no.

19         Question No. 10, the answer is no.

20         Question No. 11, the answer is no.

21         Question No. 12, the jury's answer with respect to UNO is

22    $5.5 million.  With respect to JBS Hair, the answer is zero.

23    With respect to Jinny Beauty Supply, the answer is zero.

24         Question No. 13, with respect to UNO, the dollar amount

25    is left blank.  The rate is 10 percent.  With respect to JBS

1    Hair, the dollar amount is left blank.  The rate is 10

2    percent.  And then with respect to Jinny Beauty Supply, the

3    dollar amount is left blank.  The rate is 10 percent.

4         And then the certificate is signed today's June 28, 2013,

5    signed today's date signed by Ms. Foxworth.

6         I propose to accept the verdict of the jury at this time.

7    Any legal reason not to discharge the jury and accept the

8    verdict?  Mr. Dain?

9              MR. DAIN:  No, Your Honor.

10             THE COURT:  Mr. Woo?

11             MR. WOO:  May we have the jury polled, please?

12             THE COURT:  Sure.  The poll?

13             MR. WOO:  Yes.

14             THE COURT:  All right.  Mr. Woo has asked the jury

15   to be polled.  What this means, I am going to call you by name

16   and then ask you to stand up, and I am going to ask you is the

17   verdict I have just read in court, is this your verdict, and

18   just answer yes or no.

19        Ms. Foxworth, we will start with you.  Is the verdict you

20   have returned in open court I have read, is this your verdict?

21             JUROR FOXWORTH:  Yes.

22             THE COURT:  Mr. Vallejo?

23             JUROR VALLEJO:  Yes, sir.

24             THE COURT:  Ms. Flores?

25             JUROR FLORES:  Yes.

1              THE COURT:  Ms. Woods?

2              JUROR WOODS:  Yes.

3              THE COURT:  And Mr. Brinkley?

4              JUROR BRINKLEY:  Yes.

5              THE COURT:  All right.  And Ms. Walton?

6              JUROR WALTON:  Yes, Your Honor.

7              THE COURT:  And Ms. McGlynn?

8              JUROR McGLYNN:  Yes.

9              THE COURT:  And Ms. White?

10             JUROR WHITE:  Yes.

11             THE COURT:  Okay.  Thank you.

12        Anything else?

13             MR. WOO:  Permission to speak with the jurors

14      afterwards, Your Honor?

15             THE COURT:  Let me visit with them, and I will get

16      back with you on that.

17        With that, members of the jury, we will be able to accept

18      your verdict and be able to discharge you.

19        You have been been under some instructions not to discuss

20      the case with anyone.  You are now freed from those

21      instructions.  You can discuss the case with anyone, if you

22      choose to do so.  You don't have to.  You don't owe anyone any

23      explanations.  It is just up to you.

24        If you will step back into the jury room, I will be back

25      there with you in just a few minutes.

```
 1              (Whereupon, the jury left the courtroom.)

 2              THE COURT:  Anything else that we need need to

 3    address before we adjourn?

 4              MR. DAIN:  The only issue, and I assume that might

 5    have been an issue, was because the evidence went through

 6    August of 2012, I think the issue that was in their mind, and

 7    probably with respect to the question, was they had a royalty

 8    rate in mind how that would be assessed going forward, and I

 9    think that that is probably an issue we would take up with the

10    Court in post-judgment or post-trial motions.

11              THE COURT:  Okay.  Mr. Woo, anything?  And, of

12    course, we won't decide that issue today.  You have to file

13    your motions and we will deal it through the briefing.

14         But is there anything else?

15              MR. WOO:  If the Court would entertain a brief delay

16    in entry of judgment so that we would have time to file Rule

17    50(b) motions?

18              THE COURT:  Okay.  How much time would you want?

19              MR. MARTON:  A couple of weeks.

20              THE COURT:  Okay.  All right.  Well, and we will get

21    an order out setting a date.  We will give you a couple of

22    dates, and the normal response and reply times will apply.

23         I am going to talk to the jury.  Would you like to speak

24    to the jury, did you say?

25              MR. WOO:  We would.
```

1              THE COURT:  Would you?

2              MR. DAIN:  We would.  Do you normally do that in the

3    courtroom?

4              THE COURT:  I will ask them.  I will tell them you

5    want to speak with them, and it is up to them.  And if they

6    don't want to, I will let them go.  Most juries will, but

7    occasionally we have had some that are just ready to go home.

8    But I will ask them and let you know as soon as we can.  Just

9    wait here and Jesse will let you know and show you where the

10   jury room is, but we will let you visit with them in there.

11             (The proceedings were concluded at 2:05 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts                06/28/2013

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25